No. 2--08--0769          Filed: 1-7-09

---

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

---

| | | |
|---|---|---|
| THE VILLAGE OF BENSENVILLE, ROBERTA BAIRD, WILLIAM BAIRD, ARLENE BENSON, BERNARDO FLORES, GAIL FLORES, NELSON MARRERO, and ROBERT RACKOW, | ) ) ) ) ) ) | Appeal from the Circuit Court of Du Page County. |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) ) | Nos. 07--CH--1620 07--CH--2995 |
| THE CITY OF CHICAGO, | ) ) | Honorable Kenneth L. Popejoy, |
| Defendant-Appellee. | ) | Judge, Presiding. |

---

JUSTICE O'MALLEY delivered the opinion of the court:

Plaintiffs, the Village of Bensenville, and Bensenville residents Roberta Baird, William Baird, Arlene Benson, Bernardo Flores, Gail Flores, Nelson Marrero, and Robert Rackrow (Residents), appeal the orders of the circuit court of Du Page County dismissing counts I through IV of their five-count second amended complaint against defendant, the City of Chicago (Chicago), and dissolving a preliminary injunction barring Chicago from demolishing structures in Bensenville pursuant to its plan to expand O'Hare International Airport (O'Hare). We affirm in part, reverse in part, and remand for further proceedings.

BACKGROUND

The following facts set the backdrop of this matter. We will provide additional facts as needed in our discussion of the issues.

In 2001, Chicago, as owner and operator of O'Hare, proposed the O'Hare Modernization Program (OMP), which would reconfigure and expand O'Hare's facilities, with the purpose of streamlining air traffic and reducing flight delays. The primary measure in the OMP is the installation of parallel runways to replace O'Hare's existing body of intersecting runways, to which the Federal Aviation Administration (FAA) has attributed much of O'Hare's inefficiency. The OMP outlines a two-phased "Master Plan" for expansion. Phase 1 calls for the expansion of an existing runway, the reconfiguration of taxiways and a concourse, and the construction of two new runways, a new western satellite terminal, and an underground automated transit system or "people mover" connecting the new satellite terminal with the main terminal.[1] Phase 2 envisions the expansion of another existing runway and the construction of two additional new runways as well as a "world gateway terminal."

In 2003, the Illinois General Assembly enacted the O'Hare Modernization Act (Act) (620 ILCS 65/1 et seq. (West 2006)). In its prefatory findings, the legislature determined that "O'Hare cannot efficiently perform its role in the State and national air transportation systems unless it is reconfigured with multiple parallel runways." 620 ILCS 65/5(a)(2) (West 2006). The legislature found it "essential" that the OMP "be completed efficiently and without unnecessary delay" and that "acquisition of property as required for the [OMP] be completed as expeditiously as practicable." 620 ILCS 65/5(a)(6), (a)(7) (West 2006). To carry out Chicago's expansion efforts, it is empowered

---

[1]An FAA document in the record states that construction of the western terminal is projected to be "initiated" during Phase l but is "independent of other Phase 1 components."

by the Act to "acquire by gift, grant, lease, purchase, [or] condemnation \*\*\*, or otherwise any right, title, or interest in any private property," including property outside Chicago's boundaries. 620 ILCS 65/15 (West 2006). The Act allows acquisition of property "that [Chicago] reasonably determines will be necessary <u>for future use</u>, regardless of whether final regulatory or funding decisions have been made." (Emphasis added.) 620 ILCS 65/15 (West 2006). The Act also contains a broad preemption clause providing: "Airport property shall not be subject to the laws of any unit of local government except as provided by ordinance of [Chicago]." 620 ILCS 65/25 (West 2006).

The OMP identifies 615 parcels in Bensenville that Chicago believes it must acquire in order to complete the expansion project at O'Hare. These parcels, situated off the southwest corner of O'Hare, are collectively identified by the OMP as the "Southwest Acquisition Area" (Acquisition Area). The properties in the Acquisition Area are variously improved with residential, commercial, and industrial structures. Plaintiffs all own properties in the Acquisition Area. Chicago has initiated eminent domain proceedings against those properties. This suit, City of Chicago v. Forest Preserve District of Du Page County, No. 06--ED--111, is pending before Judge Stephen J. Culliton in the circuit court of Du Page County.[2] As for the remaining properties in the Acquisition Area, it appears that Chicago has acquired the great majority of them, though precisely how many is unclear. It also appears that some were acquired through eminent domain proceedings and some through voluntary sales, but again the respective numbers are not clear from the record.

---

[2]The record does not clearly show whether all of the Residents have properties involved in the Culliton proceeding or, moreover, whether any properties owned by Bensenville itself are involved. The parties appear to assume that the Residents and Bensenville all have properties at stake in the Culliton proceeding, and we proceed on that assumption.

In 2006 and 2007, Chicago drafted plans for demolishing structures it acquired or planned to acquire in the Acquisition Area. Chicago also developed a "Demolition Health and Safety Plan," which described Chicago's measures for insuring that the demolition would proceed without risk to public safety.

On June 28, 2007, plaintiffs initiated the present action by filing a two-count complaint against Chicago. Count I sought a declaratory judgment that Chicago's demolition plans must comply with Bensenville's recently enacted Demolition Ordinance, which provides detailed permit requirements for all demolition within the Bensenville village limits. Bensenville Village Code §9--6a--2(F) (eff. February 27, 2008). The Demolition Ordinance provides that any application for a demolition permit must include plans for replacing the structures planned for demolition. Bensenville Village Code §9--6a--2(B) (eff. February 27, 2008). The Demolition Ordinance contains a specific exception for Chicago's demolition of structures in the Acquisition Area, provided Chicago demonstrates that the demolition is "necessary" to accomplish the OMP. Bensenville Village Code §9--6a--2(C)(2) (eff. February 27, 2008).

Count II of plaintiffs' complaint alleged that demolition under the plans proposed by Chicago would constitute a public nuisance, as it would "expose *** Bensenville residents and their families to toxic or hazardous substances and chemicals released by the demolition."

Plaintiffs simultaneously moved for an injunction barring Chicago from demolishing any properties in the Acquisition Area during the pendency of the lawsuit. Plaintiffs alleged that Chicago planned to demolish the properties without having quantified all potentially harmful substances in the structures and soils of the properties or designed appropriate measures to control the release of such substances into the air or ground water during demolition. Plaintiffs attached to their motion

sworn declarations from Kenneth Mundt and Mark Travers, both employees of Environ, a firm retained by Bensenville to assess the health risks posed by demolition of structures in the Acquisition Area.

Mundt, an epidemiologist, averred in his declaration that the demolition as planned by Chicago would "create[] a significant potential endangerment to the health and safety of Bensenville residents and their families." Mundt stated that he had reviewed Chicago's plan for controlling emissions of harmful substances during demolition and found it inadequate to protect either demolition workers or Bensenville residents who live in the Acquisition Area or in the vicinity. Mundt identified hazardous substances that are likely present in the structures or soils in the Acquisition Area:

"Based on the mix of industrial, commercial, and residential structures in the Acquisition Area (as well as the historical uses of the area), it is highly likely that the following hazardous or toxic substances are present in the structures to be demolished (or in the surrounding soils and groundwater): lead, mercury, pesticides, insecticides and herbicides, polychlorinated biphenyls (PCBs), chemical wood preservatives such as chromate copper arsenate, pentachlorophenols, creosote, paint and solvent compounds containing volatile organic compounds, petroleum wastes containing benzene and PAHs (polycyclic aromatic hydrocarbons), pathogenic mold spores, and septic system wastes containing bacterial and viral pathogens."

Mundt stated that these substances can, depending on their concentrations, cause "severe adverse health effects including lung diseases, central nervous system damage, learning disabilities in children, cancer, birth defects, liver damage, and damage to reproductive systems." Mundt cautioned

that a full list of the hazardous substances in the Acquisition Area was not possible until the area was comprehensively investigated and tested.

Mundt described a three-step process that he recommended be completed before demolition. The first step is a comprehensive area-wide field investigation and sampling. This step involves identifying "the locations, types, and quantities of hazardous or toxic materials in and around the structures to be demolished." Mundt contrasted this approach with Chicago's proposed method of testing, which he criticized as "start-stop" because Chicago intended to test and demolish piecemeal rather than test the site in full before commencing demolition. Mundt opined that Chicago's method was inadequate because it failed to consider the additive or cumulative effects of releases from multiple parcels or structures.

The second step, according to Mundt, is to develop a baseline risk assessment, which involves using data from the field-testing stage to calculate the degree to which demolition will expose to hazardous substances demolition workers and residents living in the Acquisition Area or its vicinity. If the exposure is likely to exceed "accepted levels of public health protection," then strict controls are necessary to reduce the exposure to acceptable levels. Mundt averred that, since Chicago did not perform proper field testing, it necessarily could not have performed a proper risk assessment.

The third step, explained Mundt, is to establish "sufficiently strict control measures" to insure that levels of exposure do not exceed "accepted levels of public health protection." Mundt opined that, since Chicago did not perform proper field testing or prepare a proper risk assessment, Chicago has no basis for claiming that its demolition proposal will adequately protect public health.

In his declaration, Travers, a geologist, noted that Bensenville's Demolition Ordinance requires an applicant for a demolition permit to submit plans for (in his words): (1) "a comprehensive investigation of the location, type, and quantity of hazardous chemical[s] and materials in the entire area to be demolished"; and (2) demolition controls that "minimiz[e] the public health risk from release of those hazardous chemicals during demolition." Travers opined that the Demolition Ordinance "is a carefully developed and organized set of requirements designed to protect the public health and safety of Bensenville residents and their families from exposure to hazardous or toxic chemicals and materials that may be released during demolition activities." Travers averred that Chicago's compliance with the Demolition Ordinance was "essential" for public protection.

At a July 2007 hearing on the motion for injunctive relief, the trial court held that count I did not provide a basis for an injunction because plaintiffs were not likely to succeed on the merits. The court reasoned that the Demolition Ordinance was preempted by section 25 of the Act, which provides that "[a]irport property shall not be subject to the laws of any unit of local government except as provided by ordinance of [Chicago]." 620 ILCS 65/25 (West 2006). The court did, however, find a basis for injunctive relief in count II, alleging a public nuisance. The court entered a preliminary injunction:

> "against [Chicago] on any further demolition of any kind or nature within [the Acquisition Area] until an area-wide field investigation and sampling program is done identifying any location, type and quantities of hazardous or toxic materials in or around the structures to be demolished in the demolition area."

As for the duration of the injunction, the court said:

"Once that area-wide field investigation and sampling program has been completed, then we will hold an evidentiary hearing in regard to the findings that have been made, any expert testimony that either Bensenville or [Chicago] may wish to put forth in open court, and any other testimony that may be relevant in regard to same for this Court to make a determination whether [the] preliminary injunction [should continue] *** or whether [it] [should] terminate at that point with there being sufficient safeguards and protection for the public health of those residents of Bensenville and the surrounding areas to satisfy this Court."

The court put the matter over for status.

In October 2007, plaintiffs filed a four-count amended complaint. Count I alleged common-law fraud, in that Chicago knowingly made to property owners in the Acquisition Area false statements that all of their parcels are necessary for completion of the OMP. Plaintiffs alleged, without elaboration, that, "[w]ith the exception of one parcel of property owned by [Bensenville]," none of the properties in the Acquisition Area are needed for Phase 1 of the OMP. Plaintiffs alleged that only a portion of Phase 1 received the requisite approval from the "Majority-In-Interest Airlines" (MII Airlines) at O'Hare. Plaintiffs asserted that only Phase 2 could possibly warrant acquisition of plaintiffs' properties in the Acquisition Area but that Phase 2 was unlikely ever to be completed, because the MII Airlines probably would not approve Phase 2 given its projected cost. Plaintiffs asserted that Chicago knows that completion of Phase 2 is unlikely and that Phase 2 "is little more than a public relations creation by Chicago to provide a false justification for acquiring and destroying the residential and commercial properties in the Acquisition Area."

Count II of the complaint pleaded constructive fraud based on the same false statements alleged in count I. Count III reasserted the first complaint's claim that the Demolition Ordinance

governs the demolition of properties in the Acquisition Area. Count IV realleged that the demolition would constitute a public nuisance if it proceeded under the plans proposed by Chicago.

Chicago moved to dismiss counts I through III, pursuant to section 2--615 of the Code of Civil Procedure (Code) (735 ILCS 5/2--615 (West 2006)). The trial court granted the motion as to counts I and II but not count III. The court dismissed count I on the grounds that: (1) Chicago's statements as to Acquisition Area properties' necessity for the OMP were legal opinions based on statutory or constitutional criteria for condemnation and therefore were not proper subjects of a fraud action, pursuant to Stern v. Norwest Mortgage, Inc., 284 Ill. App. 3d 506 (1996); (2) Chicago's statements that it would use the properties for either Phase 1 or Phase 2 were statements of future intent and therefore not actionable as fraud (see People ex rel. Peters v. Murphy-Knight, 248 Ill. App. 3d 382, 387 (1993) ("[s]tatements regarding future events are considered opinions, not statements of fact," and therefore cannot be fraudulent)); (3) plaintiffs' alleged damages were "speculative at best" because plaintiffs did not allege that Chicago had no intent to use the properties for Phase 1 or Phase 2; and (4) relatedly, the lack of final approval for Phase 1 or Phase 2 did not vitiate Chicago's ability to acquire the properties, because the Act allows acquisition of properties that Chicago "reasonably determines will be necessary for future use, regardless of whether final regulatory or funding decisions have been made" (emphasis added) (620 ILCS 65/15 (West 2006)).

The court dismissed count II because plaintiffs set forth no facts that would prove "the existence of a fiduciary relationship between Chicago and Bensenville." In denying the motion to dismiss with respect to count III, the court reasoned that Chicago's sole contention was that the ordinance was preempted by the Act, an affirmative matter not properly claimed in a section 2--615 motion. The court noted that the dismissal of counts I and II was without prejudice.

In November 2007, Chicago filed with the court a status report regarding its plans for surveying and sampling the Acquisition Area as previously ordered by the court. Chicago informed the court that it had retained the firm of Conestoga-Rovers and Associates (CRA) to conduct the investigation. The court set July 7, 2008, for an evidentiary hearing on whether the preliminary injunction should continue.

On March 11, 2008, plaintiffs filed a five-count, second amended complaint. Count I of the second amended complaint was entitled "Declaration and Injunctive Relief as to the Constitutionality of the O'Hare Modernization Act." In their foundational allegations, plaintiffs averred that Chicago "has acquired--either through eminent domain or threat of eminent domain--several hundred \*\*\* residential and commercial properties in Bensenville in the Acquisition Area." Plaintiffs further alleged that Chicago is currently seeking to acquire through eminent domain plaintiffs' own properties.

Plaintiffs pleaded for two declarations. First, plaintiffs sought a declaration that the Act does not override the requirement of article I, section 15, of the Illinois Constitution, the takings clause, that "the courts \*\*\* decide after an evidentiary hearing whether any particular parcel is necessary" for a public purpose. See Ill. Const. 1970, art. I, §15 ("Private property shall not be taken \*\*\* for public use without just compensation as provided by law"); People ex rel. Director of Finance v. Young Women's Christian Ass'n, 86 Ill. 2d 219, 232 (1981) (YWCA) (the takings clause of the Illinois Constitution " 'is a restraint and limitation placed upon the exercise of [the condemnation power] as against the right of the private citizen except in those cases where public necessity requires the taking of private property for public use' "), quoting Department of Public Works & Buildings v. Ryan, 357 Ill. 150, 154 (1934).

Second, plaintiffs sought a declaration that Chicago did not satisfy the constitutional requirement of necessity in "taking" properties in the Acquisition Area. In support, plaintiffs alleged that only a portion of the OMP's Phase 1, i.e., the "Phase 1 Airfield Project," was currently in progress. Plaintiffs further alleged that, "[w]ith the exception of a small number of properties on the north end of the so-called 'Acquisition Area,' Chicago has no need for any properties in Bensenville for [Phase 1]--or the Phase 1 Airfield Project." With respect to Phase 2, plaintiffs averred that "there is no certainty that [Phase 2] will be constructed within any reasonable period of time as required by the necessity limitations of the Illinois Constitution." Plaintiffs alleged that, "despite this lack of necessity for property in Bensenville, Chicago has acquired--through eminent domain proceedings or the threat of eminent domain--several hundred residential and commercial properties in Bensenville on the false assertion that these properties are necessary" for the OMP.

In addition to declaratory relief, plaintiffs asked that Chicago be ordered to restore "to their prior state and condition" the properties it "acquired" from the Acquisition Area. Plaintiffs also asked that Chicago be enjoined from "further acquisitions" of property in Bensenville "under any claim that the properties are necessary" for the OMP, until Chicago proves its compliance with the constitutional necessity requirement.

Count II pleaded common-law fraud. Plaintiffs made the following core allegations:

"(A) **False statement of material fact.** Here the false statements of material fact are Chicago's false factual allegations made to meet the necessity requirement of the Illinois Constitution.

i. That all of the properties in the Acquisition Area are needed for [Phase 1]

when at most only a few parcels are needed; the vast majority of Plaintiffs' properties are not needed; and the vast majority of parcels in the Acquisition Area are not needed for the 'Phase 1 Airfield Project' or any portion of [Phase 1].

ii. That all of the properties in [the] Acquisition Area are needed for the future [Phase 2] and that the necessity requirement of the Illinois Constitution is met because [Phase 2] will be constructed by 2014. This statement of future need is false because Chicago has no basis in fact to assert that [Phase 2] will be constructed by 2014 or any future date, if ever.

(B) **Defendant's knowledge that the statement is false.** Chicago knows that its factual assertions as set forth in paragraph (A) are false.

(C) **Defendant's intent that the false statement induce the Plaintiffs to act.** *** Here Chicago knew and intended its false factual statements as to necessity would cause many property owners to sell their homes and businesses under threat of eminent domain. The false statements by Chicago as to the facts--i.e., that Chicago had demonstrated a factual basis of constitutional necessity in accordance with the Illinois Constitution's limitations on the power of eminent domain--were made to property owners who sold their homes and businesses under threat of eminent domain and to the DuPage [sic] County Circuit Court which unwittingly accepted these assertions as the truth.

(D) **Plaintiffs' reliance on the truth of the false statement.** Here many--indeed hundreds of property owners--sold their homes to Chicago under threat of eminent domain in reliance on the truth of Chicago's false statements as to necessity to take their properties. In turn by selling their homes in response to these false statements as to necessity, these

property owners (with the assistance and encouragement of Chicago) left the neighborhood a deserted wasteland."

Plaintiffs alleged as injuries that: (1) parts of the Acquisition Area have been turned into "a virtual wasteland" in that the acquired properties are uninhabited, and plaintiffs have suffered a resulting "[l]ack of community"; and (2) the loss of neighboring properties has diminished plaintiffs' property values and the reduction in the tax base has led to higher taxes.

Count III alleged unjust enrichment. Plaintiffs pleaded that "Chicago has improperly and unjustly obtained and continue[s] to retain the use of the properties in the Acquisition Area by violating the necessity limits of the Illinois Constitution and by false statements as to necessity."

Count IV realleged the claim from the prior complaints that demolition in the Acquisition Area was governed by the Demolition Ordinance. Count V realleged the public nuisance claim from the prior complaints.

Plaintiffs also filed a motion for injunctive relief under counts I through III of the second amended complaint. Also, under count V, plaintiffs sought the same injunctive relief that was currently in place. Plaintiffs did so to preserve the status quo in the event the court dissolved the injunction at the July 2008 evidentiary hearing.

On April 11, 2008, Chicago moved to dismiss counts I and IV, pursuant to section 2--619 of the Code (735 ILCS 5/2--619 (West 2006)), and counts II and III pursuant to section 2--615 of the Code. Plaintiffs filed a response to the motion. To particularize their allegations of fraud in count II, plaintiffs attached an affidavit from Joseph Del Balzo, former acting administrator of the FAA. Del Balzo averred that he reviewed documents relating to the OMP and found that Phase 1 requires

only 33 properties in the Acquisition Area, not 615 properties as Chicago claimed. Del Balzo further determined that none of the documents indicates an estimated completion date for Phase 2.

On June 26, 2008, the trial court dismissed counts I and IV under section 2--619 and counts II and III under section 2--615. The court first addressed the grounds for dismissing counts I and IV. The court construed count I as alleging "that Chicago's acquisition of properties in Bensenville is unconstitutional because those properties are not necessary, as required by the Illinois Constitution." The court proceeded from the premise that, "[if] property is not necessary for [a] public project, there is no constitutional authority to take the property--despite what the Legislature has asserted in the authorizing statute." The court distinguished between properties owned by plaintiffs, which Chicago is presently attempting to acquire in the proceedings before Judge Culliton, and all other properties in the Acquisition Area, which the court noted were "owned by individuals who contracted with Chicago for the sale of those properties."[3]

The trial court held that plaintiffs' claims respecting their own properties were barred on the ground that there is "another action pending between the same parties for the same cause" (735 ILCS 5/2--619(a)(3) (West 2006)), namely, the eminent domain action before Judge Culliton. The trial court found that the proceedings before Judge Culliton could provide plaintiffs "complete relief" with respect to their own properties. As for the remaining properties, the trial court held that plaintiffs lacked standing to challenge their acquisition by Chicago. The court noted plaintiffs' reliance on two cases, People ex rel. Klaeren v. Village of Lisle, 202 Ill. 2d 164 (2002), and Yusuf

---

[3]This is contrary to plaintiffs' allegation, and the assumptions of the appellate briefs, that some of these properties were acquired through eminent domain proceedings.

v. Village of Villa Park, 120 Ill. App. 3d 533 (1983), to establish standing, but the court found that plaintiffs alleged injuries unlike those in Yusuf or Klaeren.[4]

As for count IV, the court held that, in light of section 25 of the Act (620 ILCS 65/25 (West 2006)) ("Airport property shall not be subject to the laws of any unit of local government except as provided by ordinance of [Chicago]"), it is "clear *** that any property acquired by the City of Chicago for the purposes of OMP is not subject to the Bensenville Demolition Ordinance."

The court then turned to counts II and III, which alleged fraud and unjust enrichment, respectively. On count II, the court reasoned:

"This court reaches the same conclusion it reached the last time plaintiffs presented a fraud claim--the alleged damages are speculative at best. The acquired properties are to be used for the benefit of the State of Illinois, and there is no evidence that Chicago plans to use them for anything else. Assurance as to future events is generally not considered misrepresentation of fact. [Citation.] As such, Chicago's stated intention to use the acquired properties for the [OMP] cannot be considered fraud. In addition, a legal position, even if alleged to be wrong, is not fraud. [Citation.] Therefore, Chicago's legal position that it has discretion (granted by the Illinois legislature) to determine what parcels of land it requires for completion of the [OMP] cannot be considered a fraudulent statement."

On count III, the court said:

---

[4]Plaintiffs did not argue, and the trial court did not on its own consider, what standing Bensenville might have as the municipality in whose territorial boundaries another government body seeks to acquire property by eminent domain.

" 'To state a cause of action for unjust enrichment, a plaintiff must allege the defendant unjustly retained a benefit to the plaintiff's detriment, and the defendant's retention violated the fundamental principles of justice, equity, and good conscience.' [Citation.] *** [T]here is no fact pleading that supports the proposition that Chicago intends to use the acquired properties for anything other than expansion of O'Hare. The properties are not for the benefit of the City of Chicago. In addition, Chicago paid for each of the acquired properties in real estate contracts with former owners of those properties. 'Where there is a specific contract which governs the relationship of the parties, the doctrine of unjust enrichment has no application.' [Citation.]"

The court also denied, as moot, plaintiffs' motion for injunctive relief under counts I through III. On June 30, 2008, plaintiffs petitioned this court for leave to take an interlocutory appeal from the denial of their motion. This court denied the petition.

On July 7-10, 2008, the trial court held an evidentiary hearing on whether its injunction should continue against demolition of the properties in the Acquisition Area. Chicago presented its case first, and its first witness was Fred Blickle, an environmental engineer with CRA and an expert in developing and evaluating plans for the decommissioning and demolition of residential, commercial, or industrial structures. Blickle explained that "decommissioning" is the process of removing potentially hazardous material from a structure before demolishing it. Blickle testified that CRA was hired to perform an area-wide testing and investigation program in the Acquisition Area, to evaluate the results of the program, and to develop a decommissioning and demolition program that would protect public health.

Blickle first explained the nature and scope of the testing and investigation. CRA inspected and sampled both structures and soils in the Acquisition Area. With respect to structures, CRA inspected "600 plus" parcels in the Acquisition Area and looked for any "material[s] of concern that should be decommissioned prior to demolition." CRA inspected the structures for lead and asbestos and for "waste," subdivided by the United States Environmental Protection Agency (USEPA) into universal waste (fluorescent bulbs, batteries), household waste (cooking oils, cleaning agents, pesticides), and hazardous waste (determined by a specialized test). CRA found materials containing asbestos. CRA did not test for lead in applied paint on the structures but, rather, assumed that there was lead in all applied paint and planned to decommission the structures accordingly.

Blickle testified that CRA's inspection for waste included testing areas of concern, like stained concrete. This sampling was guided by the Toxic Substances Control Act (15 U.S.C. §2601 et seq. 2000)), which Blickle described as "the only procedure prescribed by the [USEPA] for sampling solid materials." CRA gathered 4,400 samples in all and sent them to an independent lab to be tested for the presence of hazardous waste according to the criteria of the Resource Conservation and Recovery Act of 1976 (RCRA) (42 U.S.C. §6901 et seq. (2000)). Blickle testified that CRA found household and universal waste but no hazardous waste in the Acquisition Area.

Blickle then explained CRA's methodology for soil sampling. CRA conducted two types of sampling: (1) sampling in areas of potential environmental concern (PECs); and (2) grid sampling. CRA identified PEC sites based on historical data showing the likely presence of contaminants in the soil. Grid sampling consisted of random testing within a grid of acre-sized lots imposed on a map of the Acquisition Area (with no overlap with PEC testing). Blickle testified that grid sampling was not required by the USEPA but that CRA did it as an extra precaution. Blickle testified that

CRA took samples at approximately 170 PEC sites and approximately 200 grid sites. About 400 discrete samples were taken in all.[5] CRA took samples at depths recommended by a document entitled "Soil Screening Guidance: User's Guide," promulgated by the USEPA. CRA was not able to complete testing at 21 of the PEC sites because of "access issues." Blickle testified that he was confident that nothing was present at these 21 PEC sites that CRA had not already encountered elsewhere in the Acquisition Area. Blickle testified that CRA selected the chemicals for which to test a PEC sample based on the contaminants, e.g., petroleum, that the usage history of the site indicated would likely be present in the soil. Blickle testified that grid samples were tested for substances listed on the Priority Pollutant List established by the Federal Water Pollution Control Act, commonly referred to as the Clean Water Act (33 U.S.C. §1317 (2000)).

Blickle testified that the test results for each chemical were compared against the soil screening level for that chemical. Blickle used soil screening levels developed by Dr. Elizabeth Anderson of Exponent Corporation. Blickle testified that Dr. Anderson's screening levels are conservative and that an exceedance does not necessarily indicate that disturbance of the soil will be a risk to public health. Blickle testified that 99% of the PEC samples and 99% of the grid samples were below the screening levels. Blickle testified that the exceedances that were found would not preclude demolition, because CRA had measures to control emission of contaminants within levels acceptable for public safety.

--------

[5]There is some equivocation in the record between a "parcel" and a sampling "site" or "location." From what we gather, CRA took samples at 370 "locations" or "sites" within the 615 legal parcels that comprise the Acquisition Area. A given parcel might contain more than one sampling site or location, and multiple samples might be taken at a given sampling site or location.

Blickle then described CRA's planned decommissioning procedures. Blickle testified that CRA intends to remove all waste that can be "practically" taken from the structures. As for asbestos, Blickle noted that the handling and disposition of materials containing asbestos is controlled by the National Emissions Standards for Hazardous Air Pollutants (NESHAP) (40 C.F.R. §61 et seq. (2008)), a series of federal regulations. Blickle explained that asbestos is of two types: "Regulated Asbestos Containing Material" (RACM) and non-RACM. The USEPA and the Illinois Environmental Protection Agency (IEPA) both must be notified of the presence of RACM in a structure designated for demolition. Prior to demolition, RACM must be entirely removed from the structure by a demolition contractor licensed in asbestos abatement. Non-RACM need not be removed prior to demolition. Blickle explained that, though such a measure is not required by law, CRA will dismantle rather than crush or implode structures containing non-RACM. As for lead, CRA will assume that all applied paint contains lead and will remove all flaked or flaking paint.

Blickle next described the demolition controls that CRA developed to keep emissions of contaminants to safe levels during demolition. CRA will enclose the demolition area to exclude the public and will maintain a "buffer zone" between the demolition area and occupied properties. CRA will apply water to all structures to control release of dust and will use silk screens to filter the water running off the structures. Blickle characterized the wetting of structures as CRA's "primary" control on dust. CRA will also vacuum around the structures with a device designed to catch particles down to .3 microns in size. In addition, CRA will implement a "real time" air monitoring program in an effort to confine "visible dust" to the demolition area, per the dictates of the NESHAP. CRA will monitor airborne asbestos according to the standards of the Asbestos Hazard Emergency Response Act of 1986 (AHERA) (15 U.S.C. §2461 et seq. (2000)) and lead levels according to the National

Primary & Secondary Ambient Air Quality Standards (NAAQS) (40 C.F.R. §50.1 et seq. (2008)). CRA derived from the AHERA and the NAAQS certain "action" and "trigger" levels for lead and asbestos. If an action level is exceeded, CRA will take corrective measures while continuing demolition. If a trigger is exceeded, CRA will cease demolition altogether until it achieves compliance with the emission standards. In addition to the foregoing, CRA will monitor the air for volatile organic compounds. Blickle admitted that CRA will not monitor for substances other than lead, asbestos, and volatile organic compounds. Blickle explained that demolition teams "never monitor for every constituent that's present, no matter what the site." The custom rather is to "select target compounds, indicator parameters to gauge your monitoring program."

Blickle testified that CRA will further minimize soil disturbance by demolishing just to the "pad" or slab of a structure and by filling basements with concrete rather than digging out the walls. Blickle opined that CRA's demolition controls will insure that no "appreciable" deposition of chemicals will occur in residential areas inside or outside the demolition area. Blickle admitted that CRA made no quantitative estimate of "what would come off the site during demolition." CRA saw no need to make that calculation, because its controls "are protective of any type of generation of that material" and it did not believe "anything is going to come off" the site during demolition.

Blickle acknowledged an October 31, 1997, letter from the IEPA to Nelson Steel & Wire, which had occupied in the Acquisition Area a parcel that is now the site of Pro Logis. The letter implies that at the site there had been some environmental issue for which remediation had been required. The letter refers to presently contaminated soil at the site but states that "no further remediation" is required at the site as long as certain terms are followed. The letter states in pertinent part:

"PREVENTIVE, ENGINEERING, AND INSTITUTIONAL CONTROLS

3.    Preventive:    a) A Site Health and Safety Plan for this remediation site is to be implemented in accordance with the Occupational Safety and Health Administration requirements to address possible worker exposure, should any further excavation and construction activities occure [sic] within the contaminated soil.

b) The area of the northeastern retention basin, as identified on the Site Base Map, is prohibited from recreational use. Additionally, any future activity which would expose contaminated sediments within the northeastern retention basin will require implementation of an engineered barrier meeting the requirements of 35 Illinois Administrative Codes 742.1100 and 742.1105.

Engineering:    As delineated on the Site Base Map, a six (6) inch asphalt or equivalent material cap must remain in place over the contaminated soil. The cap must be properly maintained in the future as an engineered barrier to inhibit inhalation and ingestion of the contaminated media below the cap, as well as impede contaminant migration to groundwater.

Institutional:    Within the boundaries of the site, no person shall construct, install, maintain or utilize a water system or well other than the water supply and water services available from the nearest Public Water Supply. The provisions of this institutional control shall be applicable to all

-21-

water usage including, but not limited to, domestic, commercial and

industrial uses and water for outdoor purposes."

The letter also states that the conditions specified may be revised if "(a) Further investigation or remedial action has been conducted that documents the attainment of objectives appropriate for the new land use; and (b) A new letter is obtained and recorded in accordance with Title XVII of the [Illinois Environmental Protection Act] and regulations adopted thereunder." Blickle testified that the demolition of structures at the Pro Logis site will not disturb the cap that now sits over the contaminated soil at that site.

Blickle testified that, in his professional opinion, CRA's decommissioning program and demolition controls will insure that the demolition of structures in the Acquisition Area is "clean" and not a threat to public health.

Chicago's other witness was Dr. Elizabeth Anderson, a toxicologist at Exponent and an expert in assessing risks to public health from contaminants and pollutants. Dr. Anderson testified that a proper assessment of the risk posed by a proposed demolition has three steps: (1) characterizing the demolition site, which involves identifying chemicals of potential concern; (2) identifying potential receptors of emissions and pathways of exposure, such as inhalation and ingestion; and (3) determining the overall risk on the basis of the qualitative and quantitative data. The aim of the risk assessment approach is to insure that contaminants are not released in levels that can threaten public health.

Dr. Anderson testified that, in her professional opinion, Blickle's plan for decommissioning the structures, controlling dust, and monitoring for lead and asbestos was suitably protective of public health. To evaluate the risk posed by soil disturbance, Dr. Anderson used a specialized risk

assessment paradigm called the "screening level approach," which is approved by both the USEPA and the IEPA. Dr. Anderson explained that the aim of the screening level approach is to calculate the maximum soil concentration at which a substance, if released during a soil disturbance, will not endanger public health. Dr. Anderson drew her soil screening levels from the baseline values provided in the "Tiered Approach to Corrective Action Objectives" (TACO) (35 Ill. Adm. Code §742.100 et seq., adopted at 21 Ill. Reg. 7942, eff. July 1, 1997, as amended) promulgated by the IEPA.[6] Dr. Anderson explained that TACO assumes that there has been both "a hazardous release" and "an enforcement action" and, accordingly, prescribes soil screening levels by which to plan appropriate corrective action. TACO may also be used "voluntarily," as she did here, where the issue is the risk involved in a prospective soil disturbance. Dr. Anderson testified that TACO soil screening levels are calculated differently for carcinogenic substances than for noncarcinogenic substances. Under TACO, exposure to carcinogenic substances must not cause greater than a 1 in 1 million ($1 \times 10^{-6}$) chance of developing cancer over one's lifetime. Risk associated with noncarcinogenic substances, however, is measured not as a probability but as a hazard quotient, or "the ratio of the expected exposure to the regulatory limit." Under TACO, the hazard quotient for noncarcinogenic substances must not exceed one.

Dr. Anderson testified that TACO considers the risk that demolition poses to both demolition workers and adjacent residents. TACO provides three tiers of screening values. Tier 1 provides

[6]It became apparent in later testimony that Dr. Anderson provided screening levels for chemicals she considered relevant to the risk analysis and did so independently of Blickle's test results. Therefore, it was possible that Dr. Anderson calculated screening levels for chemicals that Blickle never detected.

screening values for a certain baseline scenario, and Tiers 2 and 3 allow for modification of those values if the circumstances of a chemical release from soils differ materially from the Tier 1 scenario. Dr. Anderson explained that Tier 1 presupposes a release of contaminants due to a "very gentle soil disturbance." Tier 1 also presupposes an exposure duration of 30 years for adjacent residents and 30 days for demolition workers. Dr. Anderson modified the Tier 1 scenario in several ways. First, she assumed, commensurate with the length of the planned demolition, that both residents and demolition workers in the Acquisition Area would be exposed to released chemicals for 260 days. Dr. Anderson testified that the baseline 30-year exposure for residents was not realistic in this case because contaminants were found at "very low levels" in the Acquisition Area and Blickle's demolition controls would forestall any "large depositions that would then cause long term risk."

Second, Dr. Anderson assumed a greater soil disturbance than the baseline Tier 1 scenario and in fact employed a "Particulate Emission Factor" (PEF) 10 times more conservative than the Tier 1 default factor.

Third, as a precautionary measure, Dr. Anderson assumed that residents in the Acquisition Area would inhale released contaminants to the same degree as demolition workers. Dr. Anderson did not, however, assume any ingestion of contaminants by residents as she did for demolition workers, because ingestion by residents was unlikely given the degree of Blickle's controls.

The fourth manner in which Dr. Anderson departed from Tier 1 was to use an additive risk analysis according to the guidelines of Tier 3. Dr. Anderson explained that an additive risk analysis considers the combined effect of exposure to multiple contaminants. Dr. Anderson emphasized that the additive risk analysis considers "contaminants detected--not suspected, not possibilities." Dr.

Anderson also emphasized that the additive risk analysis considers separately the effects of noncarcinogenic and carcinogenic substances; TACO does not permit the combining of carcinogenic and noncarcinogenic effects into a single risk value. Finally, the additive risk analysis segregates effects to different parts of the body. Dr. Anderson testified that the screening levels resulting from her adjustments were more rigorous overall than even the conservative Tier 1 levels.

Dr. Anderson then described Blickle's test results and his comparison of them to her screening levels. Dr. Anderson noted that Blickle's test results showed "very, very low" concentrations of contaminants in the Acquisition Area. Blickle took these concentrations and did a "chemical by chemical" analysis, comparing each chemical to its screening level. Blickle found exceedances at 41 of the 370 locations he sampled. When Dr. Anderson did her own comparison using the additive risk model, she found exceedances at only 11 locations sampled. Dr. Anderson attributed this somewhat counterintuitive disparity to the specialized nature of additive risk analysis under TACO. For one, additive risk separates effects peculiar to discrete body parts; there is no "mixing of body parts." Furthermore, under TACO, "the cumulative risk of carcinogens [sic] contaminants attacking the same target must not exceed $1 \times 10^{-4}$," not the standard benchmark of $1 \times 10^{-6}$.

Dr. Anderson testified that, in an effort to be "more public health protective," Blickle designed his controls based on the 41 site-exceedances derived from his chemical-by-chemical analysis, not on the lower number of exceedances reached in Dr. Anderson's additive risk analysis. Dr. Anderson noted that, of the 41 exceedance sites, no soil disturbance causing a release would occur at 25 of the sites because either there are no structures at all on those sites or the soil that is contaminated is located below asphalt or concrete that will be undisturbed during demolition. Dr.

Anderson testified that another 12 of the 41 locations showed exceedances only for arsenic and benzo(a)pyrene, and these were in concentrations at acceptable background levels that TACO sets for chemicals found "frequently in the environment." On yet another site, "the limits of detection were above the risk-base soil concentration levels," and Blickle "had very generally just included [it] as a positive sample even though it was never detected." Thus, there remained just three sampling locations with unmitigated exceedances.

Asked if CRA had taken enough samples at each sampling location to be confident that it had measured the highest concentration of each contaminant found at the location, Dr. Anderson answered:

"I suppose Mr. Blickle could have sampled every square inch. But that's not the point of a sampling program.

The point of [a] sampling program is to capture the representative samples in a location."

Dr. Anderson further defended CRA's sampling program:

"If you're doing a focus sampling plan and you're trying to sample particularly the point where you think the concentration is going to be the highest and you don't really find anything that is of enormous concern--we did not find huge levels of contamination at this site--and then to proceed further to establish protective measures, I don't think you necessarily need to establish sampling plans that just continue to sample and to sample and to sample, when at this site, as I said ***, we really don't find that many enormous concerns.

We found very, very, few samples that exceeded the screening levels."

Dr. Anderson testified that CRA did not intend to remove the protective barrier in place at the Nelson Wire/Pro Logis site, but, if there were a soil disturbance, "it would need to be addressed with the [IEPA]."

Dr. Anderson testified that, in her professional opinion, the demolition planned by CRA will not threaten public health because CRA's plan for decommissioning the Acquisition Area is comprehensive and sound, the soil in the Acquisition Area has low concentrations of contaminants, and the demolition controls designed by CRA will adequately control emission of contaminants from the structures and soils.

Plaintiffs' first witness was Stanley Popelar, a geologist and expert in site assessment employed by Environ. Popelar's testimony was focused primarily on CRA's soil sampling program, which he found inadequate. Popelar emphasized first that soil samples were taken at a relatively small number of legal parcels in the Acquisition Area. Popelar noted that CRA took samples at only 147 of the 615 parcels in the Acquisition Area. Moreover, CRA identified 61 PEC parcels but took samples at only 37.[7]

Popelar criticized CRA's general sampling methodology. Popelar testified that CRA's PEC sampling concentrated almost exclusively on commercial and industrial properties even though residential properties regularly contain such contaminants as lead from paint, pesticides, chemicals

---

[7]Again, the testimony at the hearing draws a distinction between a parcel and a sampling location. As seen from Blickle's testimony, CRA often identified more than one sampling location within a given parcel and often took more than one discrete sample within a sampling location. Still, it is difficult to reconcile Blickle's testimony that only 24 PEC sampling sites remained to be tested with Popelar's testimony that 37 legal parcels remained for PEC testing.

for treating lumber, heating oil residue, and household wastes. Popelar asserted that this deficiency in the PEC sampling was not remedied by the grid sampling, which also did not cover all residential properties in the Acquisition Area.

Popelar also criticized CRA's methodology with respect to the sites it did sample. Popelar noted that, once CRA found a sample in a given location that tested positive for a contaminant, CRA did not "step out" from the point of the sample, i.e., take further samples to determine the total quantity of that contaminant at the sampling location. Popelar testified that, without knowing the total quantity of a contaminant in an area, one cannot know what quantity of that contaminant will be released during a soil disturbance, and, without knowing emission levels, one cannot design appropriate emission controls. Popelar also opined that CRA did not bore deeply enough when taking samples. Additionally, in the residential properties that were grid-sampled, CRA "typically put the soil borings out in the middle of the yard in areas [where CRA was] least likely to find contamination, not near the structures, not near [the] sources of residential contaminants."

Popelar maintained that, though underground septic and heating oil tanks are common in residential properties in the Acquisition Area, CRA did not search for such tanks in many of the residential areas. Popelar identified specifically a residential area north of Irving Park Road in Bensenville that CRA had not surveyed for septic or heating oil tanks.

Popelar concluded that CRA's sampling was "not area-wide" or "comprehensive" and that CRA failed to "identify the maximum concentrations present and/or the quantities they might be dealing with." Popelar admitted that Environ did not take its own samples from the Acquisition Area. Robert Adams, also employed by Environ, testified that he has experience in developing and evaluating decommissioning and demolition plans. Adams testified that the basic shortcoming in

CRA's demolition controls is that they are based on incomplete data. Adams observed that a large number of residential properties have not been sampled by CRA. Even with respect to the properties it has sampled, CRA has "done no assessment or review to determine what kinds of emissions will be coming off the site during the demolition process." Because "you need to know what is going to come off of the site [during demolition] to determine what the necessary controls are," CRA has no basis for claiming that its controls will limit emissions within levels consistent with public health.

Adams also questioned aspects of CRA's air monitoring program. Adams asserted that CRA's monitoring system was not sufficiently comprehensive because asbestos, lead, and volatile compounds are not reliable proxies for other contaminants, contrary to CRA's position. Adams also claimed that CRA's lead monitoring instruments are not sensitive enough to detect emissions at CRA's proposed action and trigger levels.

Adams admitted that he has not taken samples from, or otherwise investigated or examined, the Acquisition Area. He also admitted that he himself has made no estimate of the emission levels for any contaminant that could be released during demolition.

Dr. Frank Jones, a toxicologist at Environ and an expert in risk assessment, testified to the multiple points on which he disagreed with Dr. Anderson's screening level approach. First, Dr. Jones disagreed with Dr. Anderson's rejection of ingestion as a possible pathway of exposure for residents inside or outside the Acquisition Area. Second, Dr. Jones challenged Dr. Anderson's PEF. Dr. Jones stated that TACO's baseline PEF is the "Cowherd factor," which assumes "just bare exposed soil with wind blowing across the soil." Dr. Jones noted that Dr. Anderson, to account for the greater soil agitation caused by demolition, simply multiplied the Cowherd factor by 10. Dr. Jones opined

that, though TACO mandates multiplying the baseline factor by 10, there is no scientific basis for choosing 10 as the multiplier. Dr. Jones dismissed TACO's enhanced PEF as "simplistic" and noted that the USEPA has developed more sophisticated emissions factors.

Third, Dr. Jones asserted that Dr. Anderson was mistaken in substituting an exposure duration of 260 days for the 30-year default duration in TACO Tier 1. Dr. Jones explained that the default standard assumes that contaminants will travel from a demolition area into adjoining residential areas and, once deposited, will cause continual exposure until dissipated or transported elsewhere. Dr. Anderson made the substitution because she believed there would be no deposition of material that could have long-term ill effects. Dr. Jones criticized this belief as unfounded because CRA had not measured the quantity of each contaminant in the soil and therefore had an incomplete picture of emission levels or deposition amounts. Dr. Jones cited a body of literature finding that, even with "dust suppression" controls in place, demolition of structures causes "significant levels of deposition of dust" outside the demolition area. Dr. Jones concluded that Dr. Anderson had no cause for departing from the default exposure duration in TACO Tier 1. Dr. Jones admitted, however, that the prevailing winds in the vicinity of the Acquisition Area blow from the southwest. Thus, the Acquisition Area, situated between O'Hare to the northeast and the remaining sections of Bensenville to the west and southwest, is mostly downwind from the other areas of Bensenville.

Dr. Jones testified that, though he disagreed with Dr. Anderson's screening levels, he did not calculate his own screening levels but used Dr. Anderson's to perform an additive risk analysis that considers the combined effect of multiple agents. Dr. Jones employed the additive risk approach of a USEPA document entitled "Risk Assessment Guidance for Superfund, Volume I, Human Health

Evaluation Manual" (RAGS). The method of the RAGS involves dividing "your acceptable risk level by the number of potential chemicals that your--that you may have present at the site." Dr. Jones stressed that he considered the additive effects of carcinogens separately from the additive effects of noncarcinogens; he agreed that the RAGS does not allow one "to take the noncancer risk and add it to the cancer risk to determine the total risk." Dr. Jones testified that he calculated the respective additive risks for carcinogens and noncarcinogens by first adding together all screening levels Dr. Anderson provided, which yielded a total screening level. He then divided this figure, in the case of noncarcinogens, by 120 (the total number of chemicals for which Dr. Anderson provided screening levels), and, in the case of carcinogens, by 50 (the total number of carcinogenic chemicals for which Dr. Anderson provided screening levels). The higher divisor for noncarcinogens was necessary because "all chemicals have a noncarcinogenic effect, whether they are a carcinogen or a noncarcinogen." Dr. Jones acknowledged that he divided the total screening value not "by the chemicals actually detected" but by "the total number of chemicals for which [Dr. Anderson] provided a screening level."[8] He noted that, "even if it was nondetected, [a] chemical might still have been of concern." He explained in the following colloquy:

"Q. You used *** the substances that were listed in Dr. Anderson's table [of screening values] did you not?

A. That is correct.

Q. And you mentioned that some of the chemicals she had listed came back as nondetect; isn't that right?

---

[8]It is implied here that Dr. Anderson created her list of screening values independently of what Blickle detected in the Acquisition Area.

A. That is what I've been told this morning.

Q. Okay. And one of the problems with nondetect is that the sensitivity level of the chemistry may be above the level of health concern; isn't that right?

A. That is--in the field of risk assessment, if you have a detection limit that is higher than your health-based concern, you would assume that the chemical might still be there at half the detection level.

Q. Because the limits of the chemical lab may be, you have the chemical there and a health risk, but the laboratory isn't able to analyze it; is that correct?

A. Exactly."

Dr. Jones claimed that TACO dictates the same divisors as the RAGS for an additive risk analysis.

Dr. Jones testified that, under the additive risk analysis of the RAGS, he found exceedances at 52 of CRA's sampling locations, compared to Blickle's 41 exceedances. If he had used the unmodified TACO Tier 1 values (a risk limit of $1 \times 10^{-6}$, exposure through both ingestion and inhalation, and an exposure duration of 30 years), he would have found exceedances at "most" of CRA's sampling locations. Dr. Jones noted that, under TACO, if an additive risk analysis yields screening values more rigorous than the Tier 1 values, "the number[s] would default back to the Tier 1 number[s]." Dr. Jones considered this proviso in TACO "policy-based" not "health-based." If not for it, an additive risk analysis using the strict Tier 1 values would yield exceedances at every sampling location in the Acquisition Area. Dr. Jones admitted that he was "supposed to calculate additive risk by target organ" but did not do so.

Dr. Jones testified that there were "too many gaps" in CRA's data for Chicago to conclude that the demolition would not endanger public health. Particularly, CRA failed to calculate the total

quantities of contaminants found at each sampling location. Without this knowledge, CRA could not develop appropriate demolition controls because, "if you don't know what's there, you can't control for it." Dr. Jones acknowledged that it is acceptable to obtain the average concentration of a contaminant at a sampling location as long as the range of sampling is broad enough. CRA, however, did not attempt to find the average concentration at any sampling location.

Michael Paige, a Bensenville official responsible for insuring compliance with the village's codes, testified that he met with Chicago officials to discuss the proposed demolition. During these meetings, he informed Chicago officials about the likelihood of underground storage tanks and septic fields in the residential areas north of Irving Park Road. Paige also testified that, as of the hearing, 13 residential parcels in the Acquisition Area were still occupied.

Kenneth Mundt, who had submitted a sworn declaration in support of plaintiffs' original motion for injunctive relief, testified that he was the leader of the team of Environ employees who evaluated CRA's proposed decommissioning and demolition procedures. Mundt and his team tested CRA's work against the risk assessment framework Mundt had laid out in his sworn declaration. This three-stage method consists of: (1) conducting a "comprehensive area-wide sampling plan," which involves measuring the "concentration, quantity[,] and type of contaminants" in the area designated for demolition and calculating the extent to which the demolition will expose demolition workers, and residents in the vicinity, to contaminants; (2) determining whether the likely exposure, if any, is consistent with acceptable levels of public health protection; and (3) developing measures to limit exposure to within acceptable levels. Mundt testified that step one is "critical" for the others because if "good scientific data" is lacking, "whatever controls are based on [the] improper risk assessment might not be adequately protective."

Mundt opined that CRA did not conduct step one properly. Mundt asserted that CRA's survey of the demolition site was deficient because CRA did not take PEC samples at all residential properties, where the soils likely contained pesticides and lead from exterior paint. Mundt also noted that CRA did not test for pesticides in any grid or PEC sample even though they were likely present in the Acquisition Area. Mundt considered these gaps in data "irresponsible." Also, Mundt considered grid sampling intrinsically flawed as a sampling methodology because it is not directed by historical property use. Mundt testified that he did not consider grid sampling appropriate "for any purpose" and did not believe that the USEPA approves grid sampling.

Mundt criticized CRA's sampling program for the additional reason that it did not utilize "stepping out" sampling. Mundt noted that "stepping out" sampling is important because, "[i]f levels of contaminants exceed certain thresholds, we would then want to know whether we were at the very edge of the contaminated area, [or] at the center of it." "Stepping out" sampling "confirm[s] what the highest concentrations are of a particular contaminant of concern as well as the quantity of the particular contaminant of concern." Mundt admitted that he is not trained in soil sampling and has never taken soil samples himself. Mundt also admitted that Environ did no soil sampling of its own but simply critiqued CRA's methods. Mundt concluded that, because CRA's sampling was inadequate, there was insufficient data "to make a scientifically or technically supportable judgment that going forward with the demolition at this time would not pose a significant health risk" to residential areas in or near the Acquisition Area.

In rebuttal, Chicago called Dr. Anderson, who addressed Dr. Jones' criticisms of her risk assessment methods and also critiqued his proposed methods. Dr. Anderson testified that a proper risk assessment of the planned demolition in the Acquisition Area did not require her to measure the

total quantity of each contaminant in a sampling location because she used a soil disturbance model that assumed "limitless amounts of contaminant in the soil." Referencing Dr. Jones' additive risk method, Dr. Anderson asserted that she knows of no government agency that prescribes including "suspected" or "non-detected" chemicals in the divisor for additive risk analysis. Dr. Anderson suggested that such a method is "arbitrary" and "make[s] no sense." Dr. Anderson followed instead TACO's additive risk method, which provides that the divisor need include only chemicals "actually detected at the site." Dr. Anderson noted that Dr. Jones, by his own admission, did not "develop his screening levels based on target organs." Dr. Anderson suggested that Dr. Jones' analysis was further flawed because "he combined the cancer risk and the non-cancer risk to the same chemical to come up with his screening level."

Dr. Anderson testified that, since her testimony in Chicago's case-in-chief, she recalculated her screening levels using straightforward Tier 1 factors and found exceedances at 37 sampling locations. Dr. Anderson testified that this was the same number of exceedances Popelar found when he applied Dr. Jones' screening levels.

In surrebuttal, Dr. Jones testified that, since his testimony in plaintiffs' case-in-chief, he redid his additive risk model using the number of chemicals detected, not merely suspected. The result was still a set of screening levels that fell below TACO Tier 1 baseline norms (but that defaulted to the Tier 1 standards due to TACO's reversionary clause). Dr. Jones admitted that he combined the carcinogenic risk with the noncarcinogenic risk for at least three chemicals for which he provided screening levels. Dr. Jones claimed that this was an "inadvertent" error and that he was "a little sloppy" in calculating his screening levels. Dr. Jones noted that, for the three examples he identified, the noncarcinogenic risk had such a low value that it added virtually nothing to the carcinogenic risk.

On August 7, 2008, in a lengthy written opinion, the trial court dissolved the preliminary injunction against Chicago's demolition of structures in the Acquisition Area. The trial court began with a general overview of the evidence:

"The Defendant, City of Chicago, presented two expert witnesses, Mr. Fred Blickle of Conestoga-Rovers and Associates ('CRA') and Dr. Elizabeth Anderson of Exponent, Inc. ('Exponent'), in support of its position: (i) that proper precautionary measures will be taken during demolition to prevent unsafe exposure to any potentially harmful materials in the Acquisition Area; (ii) that Plaintiffs' contention that the Acquisition Area presents significant uncontrollable risks to public health is without foundation; and (iii) that Plaintiffs' claims of endangerment were not only inaccurate and speculative at the time they were made (particularly since they were not based on any investigation, sampling, testing, or modeling of the Acquisition Area by the Plaintiffs), but[,] moreover[,] have no legitimate evidentiary basis, now that there has been extensive area-wide investigation and sampling of the Acquisition Area.

The Plaintiff[s], Village of Bensenville et al., countered with their position as presented by their four expert witnesses, Mr. Stanley Popelar, Dr. Frank Jones, Mr. Robert Adams, and Dr. Kenneth Mundt, all of ENVIRON International Corporation ('ENVIRON'), that it is premature to determine whether there will be endangerment to the public health, because more investigation and sampling must first be done in the Acquisition Area. Although Plaintiffs' experts acknowledged that they have not investigated, sampled[,] or tested the Acquisition Area at any time and consequently have no data of their own on which

to base their contentions ***, Plaintiffs nonetheless contend that no demolition activities can now proceed."

To illustrate what it considered the pith of the controversy between the parties, the trial court collected the following subject headings from plaintiffs' proposed order and findings of fact:

"A. Chicago-CRA sampling was incomplete and inadequate

B. There was no proper risk assessment of the health risks to Bensenville residents and their families

a. The Level of Public Health Protection for Residents of Bensenville and their Families: $1 \times 10^{-6}$ Cancer Risk and A Hazard Index of 1

b. The Translation of the Health Based Objectives of $1 \times 10^{-6}$ and a Hazard Index of 1 into health based concentrations and quantities of toxic chemicals

i. The Foundation Assumptions To Determine Residential Health Protection--30 years vs. 260 days

ii. Multiple Toxic Chemical v. Single Chemical Exposure

iii. Chicago and Dr. Anderson's Approach--Ignore Ingestion and the 30-year Exposure Ingestion Pathway

iv. Chicago and Dr. Anderson did not report individual chemical concentrations for a health level of protection of $1 \times 10^{-6}$ and a Hazard Index of 1--using both the traditional residential assumptions of 30 yr. ingestion as well as multiple chemical exposure

c. Chicago conducted no transport dispersion or deposition analysis to determine what concentration and amounts of toxic contaminants from the

demolition activity would be deposited into the homes, day care centers, retirement homes and schools of Bensenville residents or their families

d. Dr. Anderson's rationale as to why there was no need to do a residential exposure analysis at the residential receptors (i.e., the homes and schools).

e. The dispute between Dr. Anderson and Dr. Jones Relating to Multiple Chemical Exposure

C. There is No Evidence that the Demolition Controls and Monitoring Proposed by Chicago are Adequate to Protect Public Health.

(1) Lead controls inadequate

(2) Controls and Monitoring for toxic contaminants in dust inadequate to protect public health."

After reviewing the standards for granting injunctive relief, the trial court made the following general findings:

"A year has passed since this Court's original injunctive ruling. The area-wide field investigation and sampling program that I ordered Chicago to complete was in fact completed.

I was privileged to hear the expert testimony of both Plaintiff's [sic] and Defendant's [sic] over the course of the four day hearing. Through that testimony, I 'became educated' in regard to the standards of the United States Environmental Protection Agency; the Illinois EPA; the National Emissions Standard for Hazardous Air Pollutants, the Asbestos 'NESHAP'; regulated ACM and non RACM; the Asbestos Hazardous Emergency Response Act ('AHERA'); the National Ambient Air Quality Standards for Lead ('NAAQS'); risk

assessment procedures promulgated by the IEPA in its regulatory program called 'Tiered Approach to Corrective Action Objectives,' Tier 1 and Tier 3 ('TACO'); as well as the Illinois EPA's previously issued No Further Remediation Letter ('NFR') on October 31, 1997, pertaining to the ProLogis site contained within the demolition area.

I now see that there are sufficient governmental agencies and regulations that can oversee this demolition project. In my opinion any further oversight by the Court would be done without proper authority.

By this Court attempting to exceed it's [sic] authority and to go in and oversee the entire environmental activities for the proposed demolitions would make this Court a revolving door for the parties to constantly come in requesting the Court to evaluate and review the various continuing steps and missteps which might occur in the demolition process. This Court would be called upon to be a self-imposed 'environmental protection agency' and/or risk assessment manager that would be constantly micromanaging the demolition process and having numerous hearings with differing experts [sic] opinions on what should and shouldn't be done at each step of the process.

That would leave the Court to impose its own judgment pertaining to environmental issues where agencies and regulations already exist as an oversight.

As noted herein[,] there are guidelines as to what is appropriate and there are agencies that can oversee same with their enforcement divisions as that of the EPA's.

In my opinion[,] I don't have a basis to impose any further guidelines. This Court asked for a certain investigation to be done and in my opinion that investigation has been successfully done. That investigation satisfied the basics of what this Court wanted to see

from the Defendant before they [sic] started the process of demolition. <u>I am now satisfied by the fact that the environment protection and other agencies can continue to oversee this project should there be violations of regulations, codes[,] or the like.</u>

This Court has accomplished what it wanted to do when it issued the TRO and Preliminary Injunction on a previous occasion and ordered the Defendant to do certain work to ensure that the residents were protected from many concerns that might have existed because of <u>un</u>regulated or <u>un</u>controlled activity by the City of Chicago in regards to demolition.

It is appropriate for demolition to commence now under the standards laid out by the expert testimony of the City of Chicago. Further delay creates inordinate safety issues pertaining to the existence of vacant unoccupied structures as well as the resultant safety issues within the approximate three hundred acres known as the Acquisition Area. That area with all structures properly and safely removed eliminates the current eye sore condition and eliminates the numerous concerns of fire, vandalism, and individual injuries to the public.

<u>Based on the foregoing[,] there is a separate remedy with the enforcement divisions of the various environmental protection agencies that would not require judicial intervention.</u>" (Emphases in original and added.)

The trial court then made specific factual findings as to each of the prerequisites for a preliminary injunction. See <u>Grandberg v. Didrickson</u>, 279 Ill. App. 3d 886, 888-90 (1996) (stating prerequisites for a preliminary injunction). The court said:

"**1. Ascertainable Claim for Relief**

Here, Plaintiffs claimed in their pleadings, in pertinent part, that they were entitled to continuing injunctive relief because the City's planned demolition in the Acquisition Area will endanger residents in Bensenville.

However, by the time of the July 7-10 hearing, the status quo as to residential occupancy in the Acquisition Area had materially changed. *** [A]s the testimony established, the number of residential occupied parcels has been reduced to only thirteen. Moreover, as the evidence established, the planned demolition will be protective of all remaining residents and Bensenville residents adjacent to the Acquisition Area.

Accordingly, the strength of Plaintiffs' ascertainable claims has been materially diminished, a factor which the Court may take into account in deciding whether Plaintiffs are entitled to continuing equitable relief.

**2. Likelihood of Success on the Merits**

***.

A court may enjoin an anticipated nuisance only where it clearly appears that a nuisance will necessarily result. [Citation.] ***

In this case, the Plaintiffs have not established that the City's planned demolition, with the testing and controls to be put into place, constitutes a current, existing public nuisance or that the public health will be endangered from demolition. Consequently, Plaintiffs were required, but failed, to establish that there is a fair question that they have a likelihood of success on the merits. I note this especially in light of the fact that the Plaintiffs have not performed any independent testing or evaluative field studies of their own! They

have only taken issue with that performed by the Defendant. As such[,] the Plaintiff[s] [have] not met their burden of proof for continuing injunctive relief.

### 3. Irreparable Harm

Plaintiffs have not established that they will be subject to irreparable harm as a result of the demolition for much of the same reason that they have not established a fair question of likelihood of success on the merits of their nuisance claim.

Plaintiffs have not established that they will be endangered by the City's planned demolition. As discussed above, Plaintiffs' experts at most testified that there may be an issue of concern or that they were uncertain or needed further data. However, these tentative questions and concerns do not constitute actual harm. Moreover, as the evidence at the hearing further established, not only will proper precautionary measures be taken during demolition through the application of CRA's decommissioning and demolition controls *** and air monitoring program *** to prevent any unsafe exposure to any potentially harmful materials in the Acquisition Area, but Plaintiffs' claims that the Acquisition Area presents significant uncontrollable risks to public health are simply without foundation.

### 4. No Adequate Remedy at Law

An additional element to be considered with regard to a decision as to whether continuing injunctive relief should issue is whether Plaintiffs have an adequate remedy at law.

If Plaintiffs had established their allegations that the City's demolition will endanger public health, the Plaintiffs would likely have no adequate remedy at law. But, as indicated

above, Plaintiffs have failed to do so, and consequently, the Court cannot grant the continuing preliminary injunctive relief which Plaintiffs seek.

A separate remedy does exist with the enforcement divisions of various federal and state environmental protection agencies as created by the legislative bodies. There is no further authority or basis for judicial intervention by this court.

**5. Balancing the Hardships**

The Court must also balance the hardships and the public interest in making its determination regarding whether equitable injunctive relief should issue. *** Balancing the hardships and the public interest clearly weigh in favor of terminating the preliminary injunction. This determination is _not_ made with an evaluation of necessity, which this Court excluded from this hearing as that issue is currently pending in an eminent domain action before Judge Culliton of the 18th Judicial Circuit. But the legislative history is relevant to this determination.

The Illinois legislature has determined that the OMP is a project vital to the public interest. ***

The evidence demonstrates that the demolition will occur in a manner protective of public health. As previously referenced in this opinion, the prompt demolition of City-owned buildings clearly outweighs Plaintiffs' unsubstantiated and admittedly uncertain claims of harm concerning the planned demolition.

For all of these reasons, the balance of hardships weighs in favor of demolition in the Acquisition Area, and the public interest amply supports proceeding with demolition as planned by CRA on behalf of the City of Chicago." (Emphases in original and added.)

The court ordered that the demolition:

"comply with all applicable state and federal environmental laws with respect to decommissioning and demolition of the Acquisition Area buildings, and associated building materials, equipment and contents, including but not limited to applicable provisions of the Toxic Substances Control Act, and regulations thereunder, including 40 C.F.R. Part 761; the Resource Conservation and Recovery Act, and regulations thereunder, including 40 C.F.R. Part 273; the Clean Air Act NESHAP for asbestos, 40 C.F.R. Part 61, and other federal and state regulations pertaining to asbestos in the demolition context; federal and state law pertaining to removal of underground storage tanks; and the Occupational Safety and Health Act and regulations issued thereunder, including 29 C.F.R. 1926, Subpart T."

The court further directed Chicago to complete any further testing of structures or soils that it "determines is necessary" before beginning demolition in those areas.

On August 8, 2008, plaintiffs moved for a stay of the order lifting the injunction, pending appeal. The court refused to grant "an indefinite stay" but entered a stay until September 10. On August 14, plaintiffs appealed, under Supreme Court Rule 307(a)(1) (188 Ill. 2d R. 307(a)(1)), the order lifting the injunction. Plaintiffs also appealed under Supreme Court Rule 304(a) (210 Ill. 2d R. 304(a)) the order dismissing counts I through IV of plaintiffs' complaint.

On August 18, plaintiffs moved this court for a stay of the August 7 order lifting the injunction. We granted the motion and stayed the order pending further order of this court.

DISCUSSION

I. Dismissal of Counts I through IV

We address first plaintiffs' challenge to the dismissal of counts I through IV of their second amended complaint. Counts I and IV were dismissed under section 2--619 of the Code and counts II and III under section 2--615 of the Code.

### A. Counts I and IV

"A motion to dismiss under section 2--619(a)(9) admits the legal sufficiency of the complaint and raises defects, defenses, or other affirmative matters that appear on the face of the complaint or are established by external submissions and that act to defeat the plaintiff's claim." Board of Trustees of Community College District No. 502 v. Department of Professional Regulation, 363 Ill. App. 3d 190, 196 (2006). A dismissal under section 2--619 is generally reviewed de novo. Board of Trustees, 363 Ill. App. 3d at 196.

Count I seeks a declaration that: (1) the Act does not override the requirement of the Illinois Constitution "that the courts *** decide after an evidentiary hearing whether any particular parcel is necessary" for a public purpose; and (2) Chicago did not provide the requisite justification for "taking" properties in the Acquisition Area. Count I also asks that Chicago be ordered to restore "to their prior state and condition" the properties it "acquired" from the Acquisition Area and that Chicago be enjoined from "further acquisitions" of property in Bensenville "under any claim that the properties are necessary" for the OMP until Chicago proves its compliance with constitutional requirements.

Before reviewing the trial court's grounds for dismissing count I under section 2--619, we touch briefly on that part of count I in which plaintiffs seek a declaration that the Act does not trump the constitutional restrictions on the taking of property. The trial court did not expressly rule on this request, but its remarks evince agreement with plaintiffs on the Act's relationship to the Illinois

Constitution. In its recitation of the applicable law, the trial court stated: "If property is not necessary for the public project, there is no constitutional authority to take the property--despite what the Legislature has asserted in the authorizing statute." (Emphasis added.) This is a correct statement of the law. Article I, section 15, of the Illinois Constitution, the takings clause, provides: "Private property shall not be taken *** for public use without just compensation as provided by law." Ill. Const. 1970, art. I, §15. The takings clause " 'is a restraint and limitation placed upon the exercise of [the condemnation power] as against the right of the private citizen except in those cases where public necessity requires the taking of private property for public use,' " and "[t]he legislature *** cannot, by delegating the power of eminent domain, dispense with constitutional requirements restricting its use, including the requirement of 'necessity.' " YWCA, 86 Ill. 2d at 232-33, quoting Ryan, 357 Ill. at 154; see also Davis v. Brown, 357 Ill. App. 3d 176, 183 (2005) ("the legislature cannot enact a statute that overrides or circumvents the constitution").

Despite agreeing with plaintiffs that the Act is subservient to the Illinois Constitution, the trial court dismissed the whole of count I. Presumably, the trial court considered the plea for a declaration moot upon finding other affirmative matter under section 2--619 that barred plaintiffs' claim that Chicago did not meet the constitutional requirements for acquiring the properties in Bensenville. See Sadler v. Creekmur, 354 Ill. App. 3d 1029, 1039-40 (2004) (mootness is a ground for dismissal under section 2--619). In any event, plaintiffs complain of no error in the trial court's disposition of their request for a declaration that the Act does not override constitutional requirements. Rather, it seems their goal in pressing for that declaration was to clarify that, as they claim in their brief, the Act does not prohibit them from "proceed[ing] with adjudication of their allegations that Chicago's claims of constitutional necessity for hundreds of properties in Bensenville

are false and inaccurate." The trial court agreed, as do we, that the Act presents no such bar. Whether an obstacle in section 2--619 exists elsewhere is another matter.

In presenting its reasons for dismissing count I under section 2--619, the trial court distinguished two groups of properties: (1) plaintiffs' own properties in the Acquisition Area, currently the subject of the eminent domain action before Judge Culliton; and (2) all other properties in the Acquisition Area. (The trial court assumed that all but plaintiffs' properties have been acquired by Chicago.) The trial court found these component claims barred by different affirmative matter.

First, with respect to plaintiffs' own properties, the trial court determined that plaintiffs had "an identical cause of action" before Judge Culliton and could "obtain complete relief" in that proceeding. The court held, therefore, that this component of count I was barred under section 2--619(a)(3) of the Code, which provides for dismissal where "there is another action pending between the same parties for the same cause" (735 ILCS 5/2--619(a)(3) (West 2006)).

"Section 2--619(a)(3) furthers judicial economy by avoiding duplicative litigation." Combined Insurance Co. of America v. Certain Underwriters at Lloyd's, London, 356 Ill. App. 3d 749, 753 (2005). "With respect to whether the actions are for the same cause, the crucial inquiry is whether both arise out of the same transaction or occurrence, not whether the legal theory, issues, burden of proof, or relief sought materially differs between the two actions." Jackson v. Callan Publishing, Inc., 356 Ill. App. 3d 326, 337 (2005). The "same parties" requirement of section 2--619(a)(3) is satisfied " 'where the litigants' interests are sufficiently similar, even though the litigants differ in name or number.' " Combined Insurance Co., 356 Ill. App. 3d at 754, quoting Doutt v. Ford Motor Co., 276 Ill. App. 3d 785, 788 (1995). Even when the "same cause" and "same

parties" requirements are met, section 2--619(a)(3) does not mandate automatic dismissal. Combined Insurance Co., 356 Ill. App. 3d at 754. Rather, the decision to grant or deny a section 2--619(a)(3) motion is discretionary with the trial court, unlike motions under other subsections of section 2--619 or under section 2--615. Combined Insurance Co., 356 Ill. App. 3d at 754. The reason is that "a section 2--619(a)(3) motion *** is inherently procedural and urges the trial court to weigh several factors to determine whether it is appropriate for the action to proceed." Combined Insurance Co., 356 Ill. App. 3d at 753. The following factors are relevant: (1) comity; (2) the prevention of multiplicity, vexation, and harassment; (3) the likelihood of obtaining relief in the foreign jurisdiction; and (4) the res judicata effect of a foreign judgment in a local forum. In re Estate of Hoch, 382 Ill. App. 3d 866, 869 (2008). "An abuse of discretion occurs when the ruling is arbitrary, fanciful, or unreasonable, or when no reasonable person would take the same view." Favia v. Ford Motor Co., 381 Ill. App. 3d 809, 815 (2008).

We find no abuse of discretion in the trial court's application of section 2--619(a)(3) to plaintiffs' claim that Chicago has not fulfilled its constitutional burden of proving that their properties are necessary for the OMP. First, the present proceeding and the proceeding before Judge Culliton are for the "same cause." The matter before Judge Culliton is an eminent domain proceeding by which Chicago seeks to acquire plaintiffs' properties for the OMP. In that proceeding, plaintiffs contend that their properties are not necessary for either Phase 1 or Phase 2 of the OMP. Plaintiffs present the identical challenge here. The actions also involve the same parties. Plaintiffs are all parties to the suit before Judge Culliton and so their interests naturally are well represented there.

Plaintiffs point out that "none of the several hundred properties which Chicago has already acquired, which are the subject of this case, are involved in [Judge Culliton's case]." (Emphasis added.) This fact was fully grasped by the trial court, which found separate grounds (which we review below) for granting the section 2--619 motion with respect to properties Chicago has already acquired.

Of course, as noted, the fulfillment of the "same cause" and "same parties" requirements does not entail a reflexive dismissal but rather a look at the Hoch factors. Of the four Hoch factors, the trial court gave special emphasis to the likelihood of relief in the Culliton proceeding. In seeking to upset the trial court's decision, plaintiffs offer surprisingly little argument on the Hoch factors. They certainly do not convince us that the factors weigh so heavily against dismissal that the trial court's decision was arbitrary, fanciful, or irrational. Plaintiffs' only contention is that "none of the equitable relief sought here is involved in [Judge Culliton's case]." Presumably, plaintiffs mean the declaratory and injunctive relief they seek here, but they do not present any explanation or develop any argument regarding the noninvolvement of this relief in the case before Judge Culliton. We will not make their case for them. We hold that the trial court did not abuse its discretion in dismissing, under section 2--619(a)(3) of the Code, plaintiffs' request for a declaration that their properties are not necessary for the OMP.

Turning to the trial court's grounds for dismissing count I as it relates to properties other than plaintiffs', we note that the trial court appeared to misconstrue count I, though not in a way fatal to its analysis. The trial court assumed that all of the property owners other than plaintiffs "contracted" with Chicago "for the sale of [their] properties." The source of this assumption is unclear to us. Count I alleges that Chicago acquired properties "either through eminent domain proceedings or the

threat of eminent domain." (Emphases added.) Count II alleges that "many--indeed hundreds of property owners--sold their homes to Chicago under threat of eminent domain in reliance on the truth of Chicago's false statements as to necessity to take their properties." (Emphasis added.) Yet count II also references condemnation proceedings involving some of the properties.

A distinction may possibly lie here. The complaint does not expound the phrase "threat of eminent domain," but, generally, a "taking" for constitutional purposes requires at least the formal initiation of condemnation proceedings. See Kleinschmidt, Inc. v. County of Cook, 287 Ill. App. 3d 312, 317 (1997) ("where parties agree to compensation so as to forestall a condemnation proceeding, no taking occurs"; thus, the takings clause was not triggered where, at the time of the sale, the government had not initiated eminent domain proceedings but had passed a resolution providing for condemnation in the event the parties did not agree on a purchase price); Towne v. Town of Libertyville, 190 Ill. App. 3d 563, 568 (1989) ("The taking of property in the constitutional sense is accomplished only by the filing of a petition, the ascertainment of value, and the payment of just compensation"). For the sake of clarity, we treat count I as concerning properties acquired in eminent domain proceedings where constitutional strictures applied, and count II as concerning properties acquired through voluntary sales where the constitution was not implicated but where

common-law principles (such as fraud) of course applied.[9] The lynchpin of both counts, however, is that the requisite necessity is lacking with respect to properties Chicago has acquired.

With this clarification in mind, we examine the trial court's specific grounds for dismissing the remainder of count I. The trial court reasoned that plaintiffs lack standing to challenge the condemnation of properties not their own. Lack of standing may be alleged in a motion pursuant to section 2--619(a)(9) of the Code (735 ILCS 5/2--619(a)(9) (West 2006)), which provides for dismissal on the ground that "the claim asserted against defendant is barred by other affirmative matter avoiding the legal effect of or defeating the claim." We review de novo the dismissal of a complaint for lack of standing. Winnebago County Citizens for Controlled Growth v. County of Winnebago, 383 Ill. App. 3d 735, 740 (2008).

In arguing that they have standing, plaintiffs cite Yusuf and Klaeren. In these cases, the plaintiffs were found to have standing to challenge the issuance of special use permits for properties adjoining or in the vicinity of theirs. The proposed development in Yusuf was a religious and cultural center that would also provide day-care services. The plaintiffs alleged that the development "would result in additional traffic and noise at extended hours of the day and night, would have a substantial adverse impact upon [their] quiet enjoyment of their property, and would have an adverse impact on the value of their property which is near the subject property." Yusuf, 120 Ill. App. 3d

_____

[9]Count II does also allege that Chicago made false statements about necessity to "the DuPage [sic] County Circuit Court" in condemnation proceedings involving some of the acquired properties. Plaintiffs do not, however, allege any reliance by "the DuPage [sic] County Circuit Court" on those statements. Count II is reasonably construed, therefore, as concerning transactions outside of condemnation proceedings.

at 538. The plaintiffs in Klaeren challenged the proposed construction of a retail store near their properties, and they alleged that "any increase in noise, traffic or light pollution created by the development would affect the use and enjoyment of [their] properties." Klaeren, 202 Ill. 2d at 176. In each case, the court held that the plaintiffs alleged injuries "distinct" from that of the general public and therefore could bring their claims. Klaeren, 202 Ill. 2d at 176; Yusuf, 120 Ill. App. 3d at 538.

Here, the trial court held, without analysis, that plaintiffs "alleged no such injuries" as were claimed in Klaeren and Yusuf. Plaintiffs disagree. They argue that they established standing by alleging the following injuries:

"(A) A portion of [Bensenville] has been turned into a virtual wasteland, which the [Residents] are forced to live in or give in to the demands of Chicago;

(B) Reduction in the value of [the Residents'] properties;

(C) Decreased tax base in [Bensenville] causing a rise in taxes to those taxpayers remaining in the Village; and

(D) Lack of community on the eastern edge of [Bensenville] surrounding the property owned by [the Residents]."

Plaintiffs argue that these injuries are analogous to those claimed in Klaeren and Yusuf.

We do not decide whether plaintiffs satisfy the general requirements of standing, because we hold that they manifestly fail to meet the specialized and stricter norms for intervention in an eminent domain proceeding. Section 10--5--75 of the Eminent Domain Act (735 ILCS 30/10--5--75 (West 2006)) provides:

"Intervening Petition. Any person not made a party may become a party by filing an intervening petition setting forth that the petitioner is the owner or has an interest in property that will be taken or damaged by the proposed work. The rights of the petitioner shall thereupon be fully considered and determined."

This is a codification of the rule that, "to challenge a taking, one must have a property interest affected, and one not alleging a property interest affected has no standing to challenge a taking." Lake County Forest Preserve District v. First National Bank of Waukegan, 213 Ill. App. 3d 309, 314 (1991). "The entire purpose of the [Eminent Domain Act] is to regulate the rights and duties between the condemning authority and those holding property interests. It is designed to protect the landowner from the taking of his property without just compensation." City of Crystal Lake v. La Salle National Bank, 121 Ill. App. 3d 346, 355 (1984). To establish standing under the Eminent Domain Act, one must allege a property interest that is directly infringed by the taking. See Lake County Forest Preserve, 213 Ill. App. 3d at 314 (City of Waukegan had standing to challenge proposed taking of property within its boundaries because the city owned a utility easement in the subject property; Community Unit School District No. 60, however, could not base standing on the prospect of lost revenue because its "interest in receiving tax revenue from the subject property is too remote to provide standing to appeal"); City of Crystal Lake, 121 Ill. App. 3d at 355 ("The only interest which Crystal Lake can claim is that it has filed a petition seeking to condemn the same property previously condemned under which it seeks priority. It is doubtful that this is a property right"); Midwest Television, Inc. v. Champaign-Urbana Communications, Inc., 37 Ill. App. 3d 926, 934 (1976) (finding no standing for cable provider to challenge, as effecting a taking without just compensation, an ordinance mandating that an easement previously granted to another public utility

should, if possible, be interpreted to grant a cable franchisee the same rights in the easement as the other public utility; to establish standing, plaintiff would have had to allege "that it is a property owner who has granted such an easement to another utility which might be affected"). Plaintiffs have not alleged that Chicago's acquisition of other properties in the Acquisition Area directly infringed any property interest of their own. They claim only consequential harm.[10]

As Chicago points out, plaintiffs would be no better off if they did have standing to challenge Chicago's acquisition of the properties, for they are attacking prior judgments that carry preclusive effect. Section 2--619(a)(4) of the Code provides for dismissal on the ground "[t]hat the cause of action is barred by a prior judgment." 735 ILCS 5/2--619(a)(4) (West 2006). In La Salle National Bank v. County Board of School Trustees, 61 Ill. 2d 524 (1975), the supreme court described the preclusive effect of a condemnation judgment. In La Salle National Bank, two school boards sought to sell land they acquired in separate eminent domain proceedings but later decided not to use for the purpose for which it was condemned, i.e., as sites for schools. The plaintiffs, banks that held the properties as trustees at the time they were condemned, filed suit to stop the sales, alleging that they retained a reversionary interest in the properties that was triggered when the school boards decided not to use them for school purposes. The supreme court held that the plaintiffs' claims were barred under the doctrine of res judicata:

"[Plaintiffs] had the opportunity to contend in the eminent domain action that the school authorities would take less than a fee simple estate but did not do so. No appeals were taken

---

[10]Bensenville may well have easements in some of the Acquisition Area properties it does not own in fee simple, but plaintiffs do not distinguish Bensenville's standing from that of the Residents.

from those final judgments. The judgments are not now subject to collateral attack. [Plaintiffs] cannot litigate the question they could have had decided in the original proceedings." La Salle National Bank, 61 Ill. 2d at 530-31.

Likewise here, plaintiffs, assuming arguendo that they possessed an interest to litigate in the condemnation proceedings, cannot revisit the grounds for those prior judgments.

Counsel for plaintiffs intimated at oral argument that a constitutional violation may consist of the very demolition of properties for which the condemning authority has shown no necessity. Counsel's insinuation was that, if plaintiffs have no standing to challenge the acquisition of properties other than their own, they have standing at least to seek the imposition of a constructive trust on those properties in order to forestall what plaintiffs deem an unconstitutional demolition. At least in count I, however, plaintiffs allege no illegality of the proposed demolition apart from the wrongful taking of the properties. As we have shown, plaintiffs either lack standing to challenge the condemnation of properties other than their own or are barred from collaterally attacking those condemnation judgments. For the foregoing reasons, we find no error in the trial court's dismissal of count I.

Count IV, which was also dismissed under section 2--619, sought a declaratory judgment that the Demolition Ordinance governs demolition of properties in the Acquisition Area. The trial court dismissed count IV on the ground that the Act preempts the Demolition Ordinance. "Determination of preemption of a local ordinance by a state statute involves construction of the statute and is subject to de novo review." City of Champaign v. Sides, 349 Ill. App. 3d 293, 299 (2004).

The trial court relied on section 25 of the Act, which provides: "Airport property shall not be subject to the laws of any unit of local government except as provided by ordinance of

[Chicago]."  620 ILCS 65/25 (West 2006).[11]  The trial court noted that section 10 of the Act (620 ILCS 65/10 (West 2006)) defines "airport property" in relevant part as "any property or an interest in property that is, or hereafter becomes, part of O'Hare International Airport."  The trial court concluded that "any property acquired by the City of Chicago for the purposes of the OMP is not subject to the Bensenville Demolition Ordinance."

Plaintiffs' challenge to the trial court's analysis is twofold.  First, they contend that "airport property" is property legally acquired by Chicago for O'Hare, and, because this very lawsuit challenges the legality of Chicago's acquisition of properties in Bensenville, those properties are not "airport property." The issue, however, is which legal norms govern the acquisition of property.  The Act does not attempt to override constitutional restrictions on Chicago's acquisition of property.  (Plaintiffs' constitutional challenges fail on other grounds, as noted above.)  The Act does, however, unequivocally override local restrictions on the acquisition of property pursuant to the OMP. Section 30 of the Act (620 ILCS 65/30 (West 2006)) states:

> "It is declared to be the law of this State *** that the regulation and supervision of the City of Chicago's implementation of the [OMP] is an exclusive State function that may not be exercised concurrently by any unit of local government."

"Implementation" we take to encompass all stages of the OMP from property acquisition, to demolition, to construction.  The Demolition Ordinance, being the creature of a locality, is preempted by the Act to the extent that it attempts to regulate any stage in the implementation of the OMP.

---

[11]There is no question that Chicago has not authorized regulation by any other local government.

Given the foregoing, we can dispense in short order with plaintiffs' second point, which is that the Demolition Ordinance is a public safety measure akin to the police and fire protection that Bensenville continues to provide in the Acquisition Area at Chicago's insistence. Plaintiffs wonder "how Bensenville can enforce police, fire, and other public safety laws in the Acquisition Area while being barred from enforcing its public safety and health[-]based demolition ordinance." But the issue, as Chicago notes, is whether Bensenville's police and fire protection and other public safety services "constitute attempted regulation of the OMP." Plaintiffs' argument is undercut by the very cases they cite, both of which judge a county's obligation to comply with city ordinances by whether the ordinances conflict with the statutory program carried out by the county. See Lake County Public Building Comm'n v. City of Waukegan, 273 Ill. App. 3d 15, 20 (1995) (county acting pursuant to Public Building Commission Act (50 ILCS 20/1 et seq. (West 1994)) was obligated to comply with city building ordinances designed to protect the health and safety of citizens of the city, because there was no evidence that the act exempted the county from compliance or that the ordinances would thwart the county's operations under the act); Village of Swansea v. County of St. Clair, 45 Ill. App. 3d 184, 188 (1977) (county acting pursuant to Animal Control Act (Ill. Rev. Stat. 1975, ch. 8, par. 351 et seq.) not obligated to comply with city zoning ordinances that "frustrate" the aim of the act). Plaintiffs point to no way in which Bensenville's provision of fire and police services attempts to regulate the implementation of the OMP. Here lies the difference between those measures and the Demolition Ordinance, which overtly purports to restrict the demolition of properties in the Acquisition Area. We uphold the dismissal of count IV on the ground that the Demolition Ordinance is preempted by the Act.

II. Dismissal of Counts II and III

The trial court dismissed counts II and III pursuant to section 2--615 of the Code. The following standards shape our review of dismissals under section 2--615.

"The question presented by a section 2--615 motion to dismiss is whether the allegations of the complaint, when viewed in a light most favorable to the plaintiff, are sufficient to state a cause of action upon which relief can be granted. [Citation.] Illinois is a fact-pleading jurisdiction that requires a plaintiff to present a legally and factually sufficient complaint. [Citation.] The plaintiff is not required to prove his or her case, but must allege sufficient facts to state all the elements of the asserted cause of action. [Citation.]

When ruling on a section 2--615 motion to dismiss, the trial court should admit all well-pleaded facts as true and disregard legal and factual conclusions that are unsupported by allegations of fact. [Citation.] If, after disregarding any legal and factual conclusions, the complaint does not allege sufficient facts to state a cause of action, the trial court must grant the motion to dismiss. [Citation.] The standard of review on a section 2--615 motion to dismiss is de novo." Neurosurgery & Spine Surgery, S.C. v. Goldman, 339 Ill. App. 3d 177, 182 (2003).

Count II alleges common-law fraud. As noted above, we construe count II as concerning alleged misrepresentations by Chicago in the course of voluntary transactions between Chicago and property owners other than plaintiffs. "The elements of common-law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3) defendant's intent that the statement induce plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." Wernikoff v. Health Care Service Corp., 376 Ill. App. 3d 228, 233 (2007). Corresponding to these elements, plaintiffs allege, in

relevant part: (1) Chicago made false allegations "to meet the necessity requirements of the Illinois Constitution," namely, that all of the properties in the Acquisition Area are needed for Phase 1 or Phase 2 of the OMP; (2) "Chicago [knew] that its factual assertions [were] false; (3) Chicago "intended its false factual statements as to necessity would cause many property owners to sell their homes and businesses under threat of eminent domain"; (4) "hundreds of property owners *** sold their homes to Chicago under threat of eminent domain in reliance on the truth of Chicago's false statements as to necessity to take their properties"; and (5) plaintiffs have suffered "a lack of community," diminished property values, and higher property taxes.

The trial court dismissed count II upon finding that: (1) the alleged representations are not actionable both because they constitute legal positions rather than assertions of fact and because they amount to "[a]ssurance[s] as to future events"; and (2) plaintiffs' damages are "speculative at best."

In addition to defending these grounds, Chicago argues that count II fails because plaintiffs seek to recover based on statements made to and relied on by third parties (i.e., other property owners), not plaintiffs themselves. Chicago made this argument below but the trial court did not comment on it. We, however, may consider it as a basis for affirmance. Paul H. Schwendener, Inc. v. Jupiter Electric Co., 358 Ill. App. 3d 65, 71 (2005) (dismissal under section 2--615 may be affirmed on any basis in the record).

We rely on principles laid out in Shannon v. Boise Cascade Corp., 208 Ill. 2d 517 (2004). The plaintiffs in Shannon brought a claim under the Consumer Fraud and Deceptive Business Practices Act (Consumer Fraud Act) (815 ILCS 505/1 et seq. (West 1998)) against Boise Cascade, the manufacturer of siding that was installed on the plaintiffs' homes when they were built. The plaintiffs alleged that the siding deteriorated prematurely and that Boise Cascade made false

representations about the durability of the siding in its product literature. The supreme court affirmed the trial court's grant of summary judgment for Boise Cascade. The court held that "deceptive advertising cannot be the proximate cause of damages under the [Consumer Fraud] Act unless it actually deceives the plaintiff" and that the plaintiffs' complaint was deficient for failing to allege such "actual deception." Shannon, 208 Ill. 2d at 525. The court caveated that the deception need not "always be direct between the defendant and the plaintiff" to satisfy the Consumer Fraud Act. Shannon, 208 Ill. 2d at 526. That is, the complaint would have been sufficient if the plaintiffs had alleged that the literature for the siding deceived a builder, architect, or contractor resulting in installation of the siding on the plaintiffs' homes. "In those circumstances, the purchaser, who may have no independent knowledge of the qualities or expected performance standards of siding, is deceived because of the deception of the builder, architect or contractor, who reasonably should have had correct knowledge." Shannon, 208 Ill. 2d at 526. The plaintiffs, however, did not "allege that any deceptive advertising by [Boise Cascade] was received by any plaintiff, or that it was received by any builder, architect, engineer, or other like person somehow connected with a plaintiff." (Emphasis added.) Boise Cascade, 208 Ill. 2d at 525. The plaintiffs' fraud claim thus failed. Boise Cascade, 208 Ill. 2d at 526.

As support for its reasoning, the supreme court cited St. Joseph Hospital v. Corbetta Construction Co., 21 Ill. App. 3d 925 (1974), where a hospital brought a common-law fraud claim against the manufacturer of wall paneling installed in the hospital. The hospital put forth evidence at trial that the manufacturer failed to disclose to the architect and the builder that product testing had revealed the paneling to have a flame spread in excess of that allowed by the Chicago building code. The appellate court upheld a jury verdict in favor of the hospital. St. Joseph, 21 Ill. App. 3d

at 957. The court held that there was sufficient evidence of reliance because the hospital could be said to have been deceived through the manufacturer's deception of the architect and the builder. St. Joseph, 21 Ill. App. 3d at 956. The court explained that privity "in the traditional sense" does not apply in fraud cases. St. Joseph, 21 Ill. App. 3d at 954. "It is enough," the court explained, "that the statements by the defendant be made with the intention that it reach the plaintiff and influence his action and that it does reach him and that he does rely upon it, to his damage." St. Joseph, 21 Ill. App. 3d at 954. The court cited legal commentary for support. See St. Joseph, 21 Ill. App. 3d at 955 (" 'While some connection, direct or indirect, between a party charged with making false representations and a party relying thereon must be shown, it is not essential, in support of a cause of action for damages resulting from false representations, that the false representations be shown to have been made directly to the party claiming to have relied upon them' "), quoting 37 Am. Jur. 2d Fraud & Deceit §190, at 252-53 (1968).

The suit in Boise Cascade was brought under the Consumer Fraud Act, but the supreme court cited with unqualified approval St. Joseph's requirement of actual deception in common-law fraud cases as well. Count II fails this requirement of actual deception. The claimed misrepresentations were made to third parties--other property owners--and there is no allegation that these misrepresentations flowed to plaintiffs and influenced their actions. Plaintiffs allege no reliance of their own and so fail to plead common-law fraud under Illinois law. See Premier Electrical Construction Co. v. Morse/Diesel, Inc., 257 Ill. App. 3d 445, 458 (1993) ("a common law fraud claim requires actual reliance, which means that the misrepresentations must reach the plaintiff, who must reasonably rely on them").

Plaintiffs are correct that <u>Board of Education of the City of Chicago v. A, C & S, Inc.</u>, 131 Ill. 2d 428 (1989), allows a plaintiff to recover for damages caused strictly by a third party's reliance on a defendant's misrepresentations, but plaintiffs overstate the scope of this liability. The plaintiffs in <u>A, C & S</u> sued manufacturers and suppliers of asbestos and alleged that the defendants made negligent misrepresentations about that product. The defendants argued that the trial court's dismissal of the negligent misrepresentation claim was proper under <u>Moorman Manufacturing Co. v. National Tank Co.</u>, 91 Ill. 2d 69, 88-89 (1982), which held that "economic loss is recoverable where one intentionally makes false representations [citation], and where one who is in the business of supplying information for the guidance of others in their business transactions makes negligent representations." The defendants noted that the plaintiffs made no allegation that the defendants were in the business of supplying information for the guidance of others in their business transactions. The supreme court held that it need not resolve "the question of when and against whom a plaintiff may recover <u>economic losses</u> for negligent misrepresentation" (emphasis added) because the plaintiffs alleged not just economic loss but physical harm as well. <u>A, C & S</u>, 131 Ill. 2d at 454. The court found a more apt standard in section 311 of the Restatement (Second) of Torts, entitled "Negligent Misrepresentation Involving Risk of Physical Harm." Restatement (Second) of Torts §311 (1965). Section 311 declares:

> "(1) One who negligently gives false information to another is subject to liability for physical harm caused by action taken by the other in reasonable reliance upon such information, where such harm results
>
>> (a) to the other, or

> (b) to such third persons as the actor should expect to be put in peril by the action taken."  Restatement (Second) of Torts §311, at 106 (1965).

The court observed that section 311 creates "broader liability" than section 552 of the Restatement, entitled "Information Negligently Supplied for the Guidance of Others," which requires, in part, that the defendant make the representations "in the course of his business."  Restatement (Second) of Torts §552, at 126 (1965).[12]

Plaintiffs argue that, in adopting section 311, the supreme court in A, C & S implicitly adopted its companion provision, section 310, which is entitled "Conscious Misrepresentation Involving Risk of Physical Harm" and concerns fraudulent rather than negligent misrepresentations. Section 310 provides:

> "An actor who makes a misrepresentation is subject to liability to another for physical harm which results from an act done by the other or a third person in reliance upon the truth of the representation, if the actor

---

[12]Section 311 is broader also because, as we explain below, it permits recovery for parties who did not themselves rely on the alleged misrepresentations but were damaged by those who did. The supreme court in A, C & S did not, however, apply this feature of section 311.  In remanding the case, the court noted that the plaintiffs' allegations were "very broad and unspecific" and that they would need to prove at trial "what representations were made to them and who made [the] representations." (Emphasis added.) A, C & S, 131 Ill. 2d at 456.  Apparently, the plaintiffs alleged their own reliance, not that of others.  Thus, the court relied on section 311 not for its expansive concept of reliance but for its lack of a requirement that the defendant have made the misrepresentation in the course of its business.

(a) intends his statement to induce or should realize that it is likely to induce action by the other, or a third person, which involves an unreasonable risk of physical harm to the other, and

(b) knows

(I) that the statement is false, or

(ii) that he has not the knowledge he professes." Restatement (Second) of Torts §310, at 103 (1965).

Section 310 imposes liability on the defendant for physical harm to another "which results from an act done by the other or a third person in reliance" upon a conscious misrepresentation made by the defendant. (Emphasis added.) Restatement (Second) of Torts §310, at 103 (1965). Likewise, section 311 imposes liability where the defendant makes a negligent misrepresentation to another and the other's reliance causes physical harm to "third persons." Restatement (Second) of Torts §311, at 106 (1965). Thus, sections 310 and 311 both permit recovery for parties who did not themselves rely on the alleged misrepresentation but were damaged by those who did so rely. Neither section is applicable here, however, because each presupposes physical harm and plaintiffs have not alleged that they incurred such harm.

Because plaintiffs have not alleged that they themselves relied on the misrepresentations for which they seek recovery, and because they do not claim physical harm, they have not adequately pleaded the element of reliance. The trial court, therefore, did not err in dismissing count II. In light of this holding, we do not review Chicago's other proposed bases for affirming the dismissal.

Count III of plaintiffs' second amended complaint alleges unjust enrichment. Plaintiffs allege that "Chicago has improperly and unjustly obtained and continue[s] to retain the use of the properties

in the Acquisition Area by violating the necessity limits of the Illinois Constitution and by false statements as to necessity." The trial court dismissed count III because: (1) the properties "are not for the benefit of the City of Chicago," that is, there is no indication that Chicago "intends to use the acquired properties for anything other than expansion of O'Hare"; and (2) Chicago acquired the properties through real estate contracts, and, therefore, unjust enrichment, a quasi-contractual remedy, is not available.

Chicago reiterates here an argument that it presented below but that drew no comment from the trial court. Nonetheless, the argument may serve as a basis for affirmance. See Paul H. Schwendener, Inc., 358 Ill. App. 3d at 71. Chicago notes that count III deals strictly with Chicago's acquisition of properties other than plaintiffs'. Count III is deficient, Chicago suggests, because it does not allege that Chicago accepted any benefit from plaintiffs. This does not quite identify the true problem with count III. It is not itself fatal to count III that plaintiffs are complaining about what Chicago acquired from others. "To state a cause of action based on a theory of unjust enrichment, a plaintiff must allege that the defendant has unjustly retained a benefit to the plaintiff's detriment, and that defendant's retention of the benefit violates the fundamental principles of justice, equity, and good conscience." HPI Health Care Services, Inc. v. Mt. Vernon Hospital, Inc., 131 Ill. 2d 145, 160 (1989). The doctrine of unjust enrichment permits "recovery of a benefit that was transferred to the defendant by a third party." (Emphasis added.) HPI Health Care Services, 131 Ill. 2d at 161. The defendant's retention of a benefit transferred to it by a third party would be unjust where: "(1) the benefit should have been given to the plaintiff, but the third party mistakenly gave it to the defendant instead [citation], (2) the defendant procured the benefit from the third party through some type of wrongful conduct [citation], or (3) the plaintiff for some other reason had a better claim to the benefit

than the defendant [citation]." HPI Health Care Services, 131 Ill. 2d at 161-62. From these propositions it is apparent that the real flaw in plaintiffs' claim is their failure to allege how Chicago's acquisition of the properties from the other owners deprived plaintiffs of any "benefit." Plaintiffs claim damages flowing from Chicago's acquisition of the properties, but the basis of their complaint is not that the properties should have been conveyed to them instead. Plaintiffs assert no legal or equitable interest in the properties themselves, and therefore we cannot discern what "benefit" plaintiffs claim was wrongfully intercepted by Chicago when it acquired the properties. Cf. Harper v. Adametz, 142 Conn. 218, 225, 113 A.2d 136, 139 (1955) (real estate agent unjustly enriched when he suppressed his client's purchase offer and acquired the property for himself). As plaintiffs have not alleged that Chicago is retaining a "benefit" to their detriment, we hold that the trial court properly dismissed count III of plaintiffs' second amended complaint.

For the foregoing reasons, we affirm the dismissal with prejudice of counts I through IV of plaintiffs' second amended complaint.

## II. The Preliminary Injunction Hearing

Plaintiffs argue that the trial court erred in dissolving its preliminary injunction against demolition of properties in the Acquisition Area. To obtain a preliminary injunction, the movant must establish:

> "(1) that he or she possesses a clearly ascertainable right which needs protection; (2) that he or she would suffer irreparable harm without the injunction; (3) there is no adequate remedy at law for his [or her] injury; (4) there is a likelihood of success on the merits; and (5) the plaintiff will suffer more harm without the injunction than the defendant will suffer with it. ***

* * *

*** In balancing these equities, the court should also consider the effect of the injunction on the public." <u>Grandberg</u>, 279 Ill. App. 3d at 888-90.

"The decision to grant or deny a preliminary injunction lies within the sound discretion of the trial court and on review the decision will not be disturbed absent an abuse of discretion." <u>Klaeren</u>, 202 Ill. 2d at 177.

Plaintiffs claim that the trial court abused its discretion by "abdicat[ing] *** its common law public nuisance jurisdiction in favor of non-existent administrative agency protection." Plaintiffs assert that the trial court erroneously assumed that "the judiciary either did not have independent nuisance jurisdiction, or that the trial court should somehow defer to the administrative agencies." Plaintiffs claim that these misapprehensions are evident in several of the trial court's remarks. For example, in the prefatory findings in its written order, the trial court led with this statement:

> "I now see that there are sufficient governmental agencies and regulations that can oversee this demolition project. In my opinion any further oversight by the Court would be done without proper authority."

The trial court determined that the "enforcement division[s]" of these "agencies" are adequate to redress "violations of regulations, codes[,] or the like." The trial court found it "appropriate for demolition to commence now under the standards laid out by the expert testimony of the City of Chicago" and that the court "[did not] have a basis to impose any further guidelines." The trial court concluded its general findings by stating that "there is a separate remedy with the enforcement divisions of the various environmental protection agencies that would not require judicial intervention."

As plaintiffs note, these thoughts surfaced again in the trial court's specific findings. In considering whether plaintiffs had an adequate remedy at law, the court determined:

"If Plaintiffs had established their allegations that [Chicago's] demolition will endanger the public health, the Plaintiffs would likely have no adequate remedy at law. But, as indicated above, Plaintiffs have failed to do so, and consequently, the Court cannot grant the continuing preliminary injunctive relief which Plaintiffs seek.

A separate remedy does exist with the enforcement divisions of various federal and state environmental protection agencies as created by legislative bodies. There is no further authority or basis for judicial intervention by this court."

We agree with plaintiffs that the trial court's remarks are questionable on several levels. First, they are not consistent. At one point, the court claims that these "agencies" (unnamed but for the "EPA") can "oversee" the demolition, which suggests active supervision. At another point, the court remarks that the agencies are available for redressing violations of regulations and codes, which implies not ongoing or active oversight but rather intervention as needed. Second, there is scant evidentiary ground for finding any administrative agency available to oversee the demolition in a manner active and thorough enough to prevent a public nuisance and so to serve as an adequate alternative to the equitable relief sought by plaintiffs, namely, a prospective injunction. The testimony at the July 2008 hearing contains but two allusions to potential agency involvement. The first is the October 31, 1997, "No Further Remediation" in which the IEPA implies that further soil disturbance at the Nelson Wire/Pro Logis site will lead to action by the IEPA, and the second is Blickle's testimony that the USEPA and IEPA both must be informed of the presence of RACM in

the Acquisition Area. These two points of evidence do not establish potential agency involvement nearly on the scale the court conceived.

Following oral argument, Chicago filed a motion to cite statutes and regulations that vest the IEPA and the USEPA with power to enforce environmental laws and regulations. Chicago notes, for instance, that the Illinois Environmental Protection Act (Environmental Protection Act) (415 ILCS 5/31(d)(1) (West 2006)) provides that "[a]ny person may file with the [Illinois Pollution Control] Board a complaint *** against any person allegedly violating this Act, any rule or regulation adopted under [this] Act, any permit or term or condition of a permit, or any Board order." The Environmental Protection Act also permits the State to file enforcement actions in the circuit courts. See generally 415 ILCS 5/42, 43, 44 (West 2006). We grant this motion, but note that these various authorities do not persuade us that the trial court acted correctly. Agency authority does not displace the judiciary's equitable powers in these circumstances.

Such is the lesson of Village of Wilsonville v. SCA Services, Inc., 77 Ill. App. 3d 618 (1979), where a municipality and a county sued to enjoin the operation of a newly operational landfill for hazardous waste. The plaintiffs argued that the landfill was a public nuisance because there was a risk that toxic or flammable substances would seep from the landfill. The IEPA had issued the defendant an initial permit to operate the landfill, and afterward the defendant applied for and received from the IEPA a permit for each waste the defendant proposed to deposit at the landfill. The trial court entered a permanent injunction against continued operation of the landfill. Wilsonville, 77 Ill. App. 3d at 621-23.

The defendant appealed, and the court permitted the USEPA to file an amicus curiae brief in which it defended the public need for the landfill. The defendant argued to the court "that the trial

court either lacked jurisdiction to hear the case or, in the alternative, should have deferred to the concurrent jurisdiction of the administrative agencies, IEPA and the Pollution Control Board." Wilsonville, 77 Ill. App. 3d at 623. The court rejected both positions while acknowledging "the lack of expertise in courts to fully understand the complicated technical matters involved in a case of this nature." Wilsonville, 77 Ill. App. 3d at 625. The court found that Illinois law "clearly indicate[s] a policy *** not to leave the enforcement of environmental matters exclusively in the hands of administrative agencies but to have a dual system of enforcement and civil relief." Wilsonville, 77 Ill. App. 3d at 625; see also People ex rel. Scott v. Janson, 57 Ill. 2d 451, 460 (1974) ("there exists jurisdiction [in the courts] to abate public nuisances which may endanger the general welfare").

Proceeding to the merits of the case, the appellate court upheld the permanent injunction. The defendant acknowledged that "severe damage [was] likely to result if substantial amounts of hazardous substances escaped from the landfill," but argued that the possibility of a release was "too uncertain and, in any event, too far in the distant future to form the basis for the issuance of an injunction." Wilsonville, 77 Ill. App. 3d at 633. The court disagreed, holding that the "extremely serious," indeed "catastrophic," nature of the possible harm outweighed the consideration of likelihood. Wilsonville, 77 Ill. App. 3d at 635, 638.

On appeal to the supreme court, the defendant argued for deference to the IEPA, which had licensed the landfill, and to the USEPA, which had filed the amicus brief explaining the public need for the landfill. The court declined to defer:

"The defendant *** asserts that error occurred in the courts below when they failed to defer to the IEPA and the USEPA, as well as when they failed to give weight to the permits issued by the IEPA. This assertion has no merit, however, because the data relied

upon by the IEPA in deciding to issue a permit to the defendant were data collected by the defendant, data which have been proved at trial to be inaccurate. In particular, defendant's experts concluded that any subsidence at the site would be negligible. The IEPA (as well as the USEPA) adopted this inaccurate conclusion in deciding to issue a permit to the defendant." Village of Wilsonville v. SCA Services, Inc., 86 Ill. 2d 1, 27 (1981).

Reaching the merits, the supreme court upheld the permanent injunction. The court agreed with the trial and appellate courts that "a prospective nuisance is a fit candidate for injunctive relief." (Emphasis in original.) Wilsonville, 86 Ill. 2d at 25. The court held that "the defendant is engaged in an extremely hazardous undertaking at an unsuitable location, which seriously and imminently poses a threat to the public health." Wilsonville, 86 Ill. 2d at 30. The court rejected the defendant's contention that the plaintiffs had an adequate remedy at law because they could have pursued relief through administrative channels:

"We *** disagree with the defendant that since the plaintiffs could seek review from the IEPA's decision to grant permits to the defendants through the Pollution Control Board they have an adequate remedy at law and are unable to obtain relief in a court of equity. First, the plaintiffs are not seeking a review of the issuance of permits. The plaintiffs [are seeking] to enjoin a nuisance, a matter which is properly brought in a court of equity. This court has stated that jurisdiction exists in the circuit court 'to abate public nuisances which may endanger the general welfare.' [Citation.] Thus, the trial court has subject matter jurisdiction to decide the issues raised herein, and to award appropriate equitable relief." Wilsonville, 86 Ill. 2d at 27-28.

From Wilsonville we see the error in the trial court's reasoning behind its termination of the preliminary injunction. Like Wilsonville, this case is an "environmental matter[]" (Wilsonville, 77 Ill. App. 3d at 625) in which a proposed activity is claimed to threaten a public nuisance in the form of release of hazardous substances into residential areas. Jurisdiction is no less certain here than in Wilsonville. Having jurisdiction, the trial court had a responsibility to determine, under all relevant factors, and without regard to the concurrent jurisdiction of administrative agencies, whether demolition would constitute a public nuisance. The court, however, displayed an overt reliance on the powers of administrative agencies in determining whether plaintiffs have an adequate remedy at law. The court found that "a separate remedy does exist with the enforcement divisions of various federal and state environmental protection agencies as created by the legislative bodies." This reliance was misplaced for two reasons. First, it was wrong from an evidentiary point of view because, as noted, the record contains virtually no evidence of any potential agency involvement. See Liebert Corp. v. Mazur, 357 Ill. App. 3d 265, 276 (2005) (a trial court abuses its discretion when it relies on a factual finding that is against the manifest weight of the evidence, i.e., where the opposite conclusion is clearly evident). Second, it was wrong from an institutional view--that is, as a matter of law--because, as Wilsonville teaches, the court had no cause to abdicate its judicial function even if a remedy could be found in administrative bodies. See Engel v. Loyfman, 383 Ill. App. 3d 191, 197 (2008) (a trial court abuses its discretion when its decision is based on a "misapprehension of law"). In Wilsonville, the supreme court rejected the defendant's argument that the plaintiffs had an adequate remedy at law because they could have pursued administrative review of the IEPA's decision to license the defendant's landfill. The supreme court reasoned that the plaintiffs were seeking "to enjoin a nuisance, a matter which is properly brought in a court of equity."

<u>Wilsonville</u>, 86 Ill. 2d at 27. In <u>Wilsonville</u>, there at least was an identifiable remedy available through administrative channels. Here, by contrast, there was no evidence of any available remedy, much less one comparable to the injunction sought. The trial court, we conclude, abused its discretion in finding that plaintiffs have an adequate remedy at law.

We recognize, of course, that the trial court's discussion of the "adequate remedy at law" factor appears at first blush to have alternative rationales. Immediately preceding the reference to administrative agencies, the court stated:

"If Plaintiffs had established their allegations that the City's demolition will endanger public health, the Plaintiffs would likely have no adequate remedy at law. But, as indicated above, Plaintiffs have failed to do so, and consequently, the Court cannot grant the continuing preliminary injunctive relief which Plaintiffs seek."

In actuality, this was not a finding that plaintiffs have an adequate remedy at law but rather an explanation for not reaching the issue in light of the court's findings on other factors. In that respect, it does not jibe with the court's immediately following remark about the availability of remedies from administrative agencies.

We also recognize that plaintiffs were obligated to satisfy all prerequisites for a preliminary injunction. In theory, then, our disagreement with the trial court's finding that plaintiffs have an adequate remedy at law would pose no barrier to affirmance should we determine that plaintiffs failed to meet one or more of the other prerequisites. We decline to take that avenue, since it is clear that the trial court's entire analysis was influenced by its factually unfounded and legally erroneous view of the potential role of administrative agencies in the demolition. Although the trial court's erroneous perspective does not overtly surface in its discussion of the remaining findings, the general

discussion that precedes its specific findings is pervaded with a sentiment that the court had no place adjudicating matters on which administrative agencies may act. No fewer than five times does the court mention "administrative agencies" and their "enforcement divisions." In fact, the court's discussion is bookended by two of these references. At the outset of its remarks, before even hinting at its own assessment of the alleged hazards in the proposed demolition, the court mentions that "there are sufficient governmental agencies and regulations that can oversee this demolition project" and that "further oversight by the Court would be done without proper authority." The court concludes its remarks by stating: "Based on the foregoing[,] there is a separate remedy with the enforcement divisions of the various environmental protection agencies that would not require judicial intervention." This is revealing, for, though the availability of another remedy is but one of multiple considerations in weighing the propriety of injunctive relief, the court gives it exclusive attention here. Tellingly, the court's discussion ends not with an assertion of its own jurisdiction but with an attitude of deference.

A further sign that the trial court's entire analysis was influenced by its notion of agency involvement is its failure to resolve the core conflicts in the testimony at the hearing. We have exhaustively set forth the evidence and find it teeming with polarized expert opinions on highly technical matters such as soil sampling, soil screening levels, emission factors, and demolition controls. The trial court made some reference to this testimony but its analysis shows no weighting of these radically opposed views. There is instead this summary finding:

> "[N]ot only will proper precautionary measures be taken during demolition through the
> application of CRA's decommissioning and demolition controls *** and air monitoring
> program *** to prevent any unsafe exposure to any potentially harmful materials in the

Acquisition Area, but Plaintiffs' claims that the Acquisition Area presents significant uncontrollable risks to public health are simply without foundation."

Section 11--101 of the Code (735 ILCS 5/11–101 (West 2006)) provides that every order granting or denying an injunction "shall set forth the reasons for its entry." Section 11--101 requires reasons clear and detailed enough to apprize the reviewing court of the basis for the decision. See In re Marriage of Grauer, 133 Ill. App. 3d 1019, 1026 (1985).[13] The trial court's reasoning does not contain specific enough findings based on proper considerations to allay our concern that the court diminished its judicial function by impermissibly deferring to what it perceived as the capability of administrative bodies to police the demolition. "A court commits error when it fails to exercise its discretion due to a belief that it has no discretion to exercise." RTS Plumbing Co. v. DeFazio, 180 Ill. App. 3d 1037, 1041 (1989). We therefore reverse the trial court's order terminating the

---

[13]At oral argument, Chicago claimed that the trial court's findings of fact are "extensive" and that the court's reference to the authority of administrative agencies over the demolition was not the "basis" of its decision but rather a "prefatory" or "background" observation. Chicago was then asked where in its appellee's brief it argued that the trial court properly resolved the conflicting testimony at the injunction hearing. Counsel at the podium was given the opportunity to confer with co-counsel on the question. Chicago mentioned the possibility of also submitting a written response. After counsel's conference, Chicago was unable to identify where in its brief it defended the formal sufficiency of the trial court's findings. Moreover, Chicago has since filed only a motion to cite various statutes and regulations, which motion we addressed above. Consequently, Chicago has effectively abandoned any effort to defend the trial court's findings as formally sufficient under section 11--101.

preliminary injunction and remand this case for the court to reanalyze the propriety of injunctive relief in light of our finding that the record before the court was essentially devoid of evidence of remedies available from administrative agencies and, more importantly, our holding, pursuant to Wilsonville, that any such remedies cannot replace judicial remedies in cases of this nature.

Last, we dispose of plaintiffs' "motion to cite additional authority." Plaintiffs seek to apprize us that (1) the USEPA has heightened its standards for airborne lead emissions, and (2) certain airlines operating out of O'Hare have voiced opposition to Phase 2 of the OMP. These matters are more in the nature of additional evidence than additional authority. We deny the motion without prejudice to plaintiffs seeking to raise these matters before the trial court on remand.

### III. Conclusion

For the foregoing reasons, we affirm the trial court's judgment dismissing counts I through IV of plaintiffs' second amended complaint. We reverse, however, the judgment terminating the preliminary injunction that was entered in July 2007, and we remand for further proceedings consistent with this opinion.

Affirmed in part and reversed in part; cause remanded with directions.

ZENOFF, P.J., and GROMETER, J., concur.